Kalton ADKINS, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

No. 2001–SC–0086–MR.

Supreme Court of Kentucky.

Jan. 23, 2003.

Dennis Stutsman, Department of Public Advocacy, Appellate Branch Manager, Emily Holt, Department of Public Advocacy, Frankfort, for Appellant.

A.B. Chandler, III, Attorney General, Anitria M. Franklin, Assistant Attorney General, Office of Attorney General, Criminal Appellate Division, Frankfort, for Appellee.

COOPER, Justice.

Appellant Kalton Adkins was convicted by a Pike Circuit Court jury of murder, first-degree robbery, and first-degree burglary, and was sentenced to a total of seventy years in prison. He appeals to this Court as a matter of right, Ky. Const. § 110(2)(b), contending that the trial court erred by (1) overruling his motion for a directed verdict of acquittal; (2) failing to suppress evidence obtained as a result of an investigatory stop and frisk; (3) permitting a witness to testify for the Commonwealth knowing that she would invoke her Fifth Amendment privilege against self-incrimination on cross-examination; (4) admitting incriminating statements made by Appellant to his brother after he had invoked his *Miranda* rights; (5) permitting the Commonwealth to introduce evidence of his illegal drug activity and other bad acts in violation of KRE 404(b); (6) permitting the Commonwealth to introduce inflammatory evidence in an abuse of discretion under KRE 403; and (7) failing to dismiss a juror after being informed that she may have given false information during voir dire. Finding no error, we affirm.

## I. SUFFICIENCY OF THE EVIDENCE.

Because Appellant asserts that the evidence was insufficient to support his convictions, we will summarize the evidence "draw[ing] all fair and reasonable inferences from the evidence in favor of the Commonwealth." *Commonwealth v. Benham*, Ky., 816 S.W.2d 186, 187 (1991).

On November 6, 1999, Richard "Bebay" Roberts, age sixty-eight, was beaten to death in his home on Rob Damron Road near highway 1469 (Penny Road) in Pike County, Kentucky. His daughter, son-in-law, and grandchildren discovered his body the next morning. The body was found lying near the front door clad only in

underwear. Missing from the residence were a .410 pump shotgun and the victim's wallet, in which he was known to keep large sums of money. There were blood stains on the front porch and steps and smeared blood stains leading from the door to the victim's body, indicating that the body had been pulled away from the door so that the door could be shut. There was no evidence of forced entry. The Commonwealth introduced evidence of the victim's habits [1] of sleeping in his underwear on a recliner in the living room, always keeping the doors locked at night, and always ascertaining a visitor's identity before unlocking the door. It was also his habit to never open the door to a visitor while in his underwear unless the visitor was a male with whom he was well acquainted.

Roberts was well acquainted with Appellant. Approximately twenty years before his death, Roberts cohabited with Appellant's mother, during which time Appellant and his family lived in a mobile home on Roberts's property. When the cohabitation ended, Appellant's family moved elsewhere and Appellant and Roberts apparently had no significant contact thereafter until several months before Roberts's death. Sometime prior to October 1999, Appellant came to Roberts's residence wanting to rent the mobile home as a residence for Appellant and his girlfriend, Ruth Caudill. Roberts refused. Later, in October 1999, Appellant returned to Roberts's residence wanting to sell Roberts some beefsteaks. Roberts paid for the steaks with a fifty dollar bill. Several weeks later, Appellant returned, again wanting to sell Roberts some meat. This

time, Roberts declined. Because of these incidents, Roberts, who usually referred to Appellant by his nickname, "Bo," began referring to him as "the meat man."

On the night of October 30, 1999, Appellant came to Roberts's residence wanting to pawn a woman's ring. Roberts gave Appellant ten dollars and placed the ring in a small compartment of a wall clock for safekeeping. The ring was found in the compartment after Roberts's death. (Appellant's grandmother, Artie Adkins, testified that the ring belonged to her and that she had discovered it was missing shortly after Appellant and Caudill had paid a visit to her residence.) A ratchet from a military-style brass belt buckle was found on the floor near Roberts's body.[2]

Larry Branham, a neighbor and friend of Roberts, testified that he visited with Roberts on the afternoon of November 6, 1999, and that Roberts was "expecting the meat man," whom Branham identified as "Bo Adkins." Upon receiving information of Appellant's frequent visits to Roberts's residence and that Roberts was expecting him on the day of the murder, and upon learning that Appellant lived with Ruth Caudill and that Caudill owned a blue Ford Mustang, Kentucky State Police Detective Sean Welch obtained the registration number of Caudill's vehicle and began searching for Appellant.

Ruth Caudill testified that in October and early November 1999, she and Appellant were cohabiting in a mobile home on Lizzie Fork Road off highway 23 near Virgie in Pike County. The owner of the mobile home had allowed them to stay

---

1. It was error to admit evidence of the victim's habits. *Burchett v. Commonwealth,* 2003 WL 731175 Ky., —— S.W.3d —— (2003). However, the error was not preserved for review by contemporaneous objection.

2. A ratchet is a serrated piece of metal that grasps the webbing of the belt, thereby securing the buckle to the belt. A pin is that portion of the buckle that can be adjusted to permit tightening or loosening of the belt when worn.

there without rent if they would "fix it up." The mobile home had electricity but only one light bulb and no running water. Caudill had neither a job nor money; Appellant worked only "off and on" at a local automobile body shop. On the morning of November 6, 1999, Appellant and Caudill ate breakfast (crackers and a can of pork and beans), then drove Caudill's blue Mustang to Wheelwright in Floyd County to look for a "friend" of Appellant. Unable to locate the friend, they returned to the mobile home. Later that day, Appellant told Caudill he was going to visit another friend who owed him some money and departed in the Mustang. He was wearing, *inter alia*, a pair of blue jeans that had been left at Caudill's former residence by an acquaintance of her son. Since the jeans did not fit Caudill's son, she gave them to Appellant. The jeans were distinctive in that the pants size was written in indelible ink on the inside of one of the pockets. Caudill testified that she slept for two or three hours while Appellant was gone. When Appellant returned, he had with him an unspecified quantity of cocaine.

On the morning of November 7, 1999, Caudill and Appellant loaded all of their belongings into the Mustang and left the mobile home. They again drove to Wheelwright, supposedly to buy cigarettes at a Dollar Store. They then drove to Pikeville and rented a room at the Colley Motel. The motel manager testified that Appellant paid for the room with a fifty dollar bill. He also testified that the two left the motel in the blue Mustang that morning and returned later in the day.

Detective Welch, accompanied by Detective Lee Weddington, first proceeded to the mobile home on Lizzie Fork Road and found it abandoned. Welch described the property as overgrown with weeds and full of trash. The electricity had been illegally connected by tapping into a nearby utility line. After leaving Lizzie Fork Road, Welch and Weddington began checking motel parking lots and found Caudill's blue Mustang in the rear lot of the Colley Motel. Welch also observed a man matching Appellant's description (later determined to be Appellant) walking from the rear of the Mustang toward his police cruiser. When Welch approached Appellant and asked him his name, Appellant responded, "Bo." When Welch asked for his last name, Appellant responded, "Jones." When Welch asked him where he lived, Appellant responded, "Michigan." Appellant also told Welch that he was "with his girlfriend, Ruth." Confident that he was, in fact, talking to Bo Adkins, Welch asked Appellant if he could produce any identification. Appellant immediately became agitated, started shouting profanities, and loudly accused Welch and police officers in general of harassing him. Because of the late hour and the fact that there were other patrons asleep in the motel, Welch ordered Appellant to lower his voice. Appellant then told Welch that his identification was in his motel room and turned as if to walk in that direction. Welch noticed Appellant looking around as if searching for an escape route. Welch asked Appellant if he was armed and reached out to frisk Appellant's clothing for weapons. Appellant immediately started running toward the front of the motel where Welch and Weddington caught and subdued him. As the officers attempted to handcuff him, Appellant resisted their efforts and continued to shout profanities. Eventually, the officers succeeded in handcuffing Appellant, effectively placing him under arrest.

Welch charged Appellant with disorderly conduct and resisting arrest and transported him to state police headquarters in Pikeville. After being advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966),

Appellant gave Welch a statement about his activities on November 6th and 7th. He also executed a written consent to search the Colley Motel room where he and Caudill had been staying. Caudill also consented to a search of both the room and the blue Mustang.

Appellant told Welch that he left the mobile home on Lizzie Fork Road only once on November 6th and that Caudill accompanied him on that occasion. According to Appellant, he and Caudill drove to Wheelwright to talk to a man named "Mike" who had a black Mustang for sale. To get to Wheelwright from Lizzie Fork Road, Appellant drove north on highway 23, turned left on Penny Road (highway 1469), then right on highway 610 near Virgie, then left on Indian Creek Road (highway 122), and across Abner Mountain into Floyd County to Wheelwright. They waited forty-five minutes for Mike to arrive and stayed another thirty minutes while Appellant unsuccessfully negotiated for the purchase of the black Mustang. Appellant and Caudill then returned to the mobile home. On November 7th, they again drove to Wheelwright by the same route so that Appellant could take another look at the black Mustang "in daylight."

When asked if he and the blue Mustang could have been seen near the Roberts property on the night of November 6th (a ruse, since Welch had no such information), Appellant explained that, as he was driving north on highway 23 near Penny Road, he had seen a police cruiser behind him. Because he was driving on a suspended operator's license and wanted to avoid any contact with the police, he exited onto Rob Damron Road and parked in Roberts's driveway for a few minutes until the police cruiser had left the area. When asked why he had given Welch a false name, Appellant responded that he thought the police were after him "because of drugs." Apparently, Appellant then requested to speak to an attorney and the interview was terminated.

Later that night, Welch and two other officers searched the motel room and the blue Mustang. They found cocaine and drug paraphernalia in the room and subsequently charged both Appellant and Caudill with possession of a controlled substance in the first degree, KRS 218A.1415, and possession of drug paraphernalia, KRS 218A.500(2). The officers found a bag of clothing in the Mustang that included the blue jeans Caudill said Appellant had worn on November 6th. The jeans were blood-stained and subsequent DNA testing proved the blood to be that of Roberts. In the belt loops of the same blue jeans was a webbed belt with a military-style brass buckle from which the ratchet was missing. Although it could not be proven by microscopic examination that the ratchet found next to Roberts's body was the ratchet missing from the buckle found in the blue Mustang, both pieces were bent in similar fashion and both appeared to be splattered with dried blood.

Appellant's brother, Ronnie Adkison,[3] testified that he talked with Appellant at the Pike County Jail and asked him if he had killed Roberts. According to Adkison, Appellant initially denied the crime, but eventually conceded, "I might have done it," and "If I done it, I deserve to die," and for Adkison "not to hold it against Ruth."

On November 13, 1999, a resident of Indian Creek Road found Roberts's wallet on a creek bank across the road from his

---

**3.** Adkison changed his name to that of the brothers' stepfather, while Appellant retained the name of their biological father.

house. The wallet contained Roberts's driver's license and other personal papers but no money.

Thus, there was evidence that (1) the victim was expecting Appellant on the night of the murder; (2) Appellant was absent from the mobile home he shared with Caudill for two to three hours on the night of the murder; (3) Appellant admitted being on Roberts's property that night; (4) the victim was well acquainted with Appellant and would not have opened his door clad only in underwear unless the visitor was a male with whom he was well acquainted; (5) Appellant had cocaine and funds to purchase a motel room when he returned home that night; (6) the clothes Appellant wore that night were stained with the victim's blood; (7) Appellant's military-style brass belt buckle was found on a belt on the blood-stained jeans in Caudill's vehicle with the ratchet missing; (8) a ratchet from a military-style brass belt buckle similar in appearance to Appellant's buckle was found at the crime scene; (9) the victim's shotgun and billfold were missing and the billfold was found discarded along the route Appellant admitted traveling to Wheelwright on the night of the murder and the morning after; and (10) Appellant told his brother that "I might have done it." This evidence was sufficient to support the convictions. *Commonwealth v. Benham, supra,* at 187.

## II. *TERRY* STOP.

Appellant contends that Welch did not have a reasonable suspicion sufficient to justify frisking him for weapons in the Colley Motel parking lot and that the evidence obtained as a result of the attempted frisk should have been suppressed pursuant to *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). We note at the outset that Appellant does not specify (nor did he to the trial court) what evidence he claims was obtained as a result of the attempted frisk that should have been suppressed. "Appellate judges are not mind readers," *Campos–Orrego v. Rivera,* 175 F.3d 89, 94 (1st Cir.1999), and without such elucidation, evaluating Appellant's claim that he was prejudiced by the failure to suppress the unspecified evidence is virtually impossible. In fact, the frisk was never consummated and no evidence was obtained thereby. The only evidence obtained at the Colley Motel was pursuant to the consent of both Appellant and Caudill after Appellant had been arrested for disorderly conduct and resisting arrest. Nevertheless, our *de novo* review of this issue establishes that Welch had a sufficient "reasonable articulable suspicion" to conduct a *Terry* stop and to attempt to frisk Appellant for weapons.

■ *Terry* established two fundamental principles applicable to this case. First, "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." 392 U.S. at 22, 88 S.Ct. at 1880. This is true even when, as here, the felony has already been committed. *United States v. Hensley,* 469 U.S. 221, 229, 105 S.Ct. 675, 680, 83 L.Ed.2d 604 (1985).

■ Second, an officer may conduct a "reasonable search for weapons," or "frisk," for his protection "where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." *Terry, supra,* at 27, 88 S.Ct. at 1883. *See Baker v. Commonwealth,* Ky., 5 S.W.3d 142, 146 (1999) ("When an officer is justified in believing that an individual, who is unquestionably not cooperative, may be armed, it would be clearly unreasonable to deny that officer the authority to take necessary

measures to determine whether the individual is, in fact, carrying a weapon, and to alleviate the threat of physical harm."). Under *Terry* and its progeny, a "pat down" search for weapons is permitted if the totality of the circumstances indicate that the officer had a "reasonable suspicion" that the person may be armed. *Id.*

The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence.... If the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed.

*Minnesota v. Dickerson*, 508 U.S. 366, 373, 113 S.Ct. 2130, 2136, 124 L.Ed.2d 334 (1993) (internal citations omitted). Here, Appellant's flight interrupted Welch's attempt to frisk him for weapons. Therefore, there is no issue as to the scope of the unconsummated protective search; the only question is whether Welch had reason to believe that Appellant might be armed and dangerous.

■ When an officer believes that he is confronting a murder suspect, he has presumptive reason to believe that he is dealing with an armed and dangerous person. *Collier v. Commonwealth*, Ky.App., 713 S.W.2d 827, 828 (1986) ("In some cases the right to frisk for weapons will follow automatically from the circumstances, such as where the stop is for suspicion of a violent crime."); *United States v. Lawes*, 292 F.3d 123, 127 (2d Cir.2002) (finding reasonable suspicion when subject matched the description of murder suspect); 4 Wayne R. LaFave, *Search & Seizure* § 9.5(a) at 254–56 (4th ed.1996) (noting that courts generally view the right to frisk as being "automatic" when a suspect is stopped upon suspicion of having committed homicide).

■ Welch testified at the suppression hearing that although he believed that he initially had insufficient probable cause to charge Appellant with murder, Appellant was a "loose suspect" in that he was the only person believed to have been at Roberts's residence on the day of the murder other than family members and close personal friends. However, when he arrived at the motel parking lot, Welch had grounds to believe that (1) Appellant and Caudill were apparently living in abject poverty; (2) Roberts had been murdered in the course of a robbery; (3) the murderer was probably a male visitor with whom Roberts was well acquainted (evidenced by the facts that there was no sign of forced entry and Roberts was found dead clothed only in his underwear); (4) Roberts was well acquainted with Appellant who had visited Roberts's residence on at least four recent occasions; and (5) Roberts was expecting Appellant on the day he was murdered. Although Welch did not consider these facts sufficient to constitute probable cause for arrest, they were sufficient to reasonably regard Appellant as a suspect.

In addition, although Appellant gave Welch a false name and address, Welch had good reason to believe that the man in front of him was, in fact, Bo Adkins. Welch knew that (1) Appellant matched the physical description of Adkins; (2) the blue Mustang was registered to Adkins's girlfriend, Ruth Caudill; (3) Appellant was walking from the direction of the Mustang when Welch first observed him; and (4) Appellant told Welch that his name was "Bo" and that he was in the company of "his girlfriend, Ruth."

Thus, Welch had reason to believe he was dealing with the only suspect to a brutal murder. Appellant's behavior accentuated this suspicion. In addition to giving a false name and address, Appellant responded with loud profanities when requested to produce further identification. In addition, Appellant appeared to be ner-

vous and searching for an escape route. Although nervousness alone is insufficient to give rise to reasonable suspicion, it is an important factor in the analysis. *United States v. McRae*, 81 F.3d 1528, 1534 n. 4 (10th Cir.1996). In the instant case, Appellant's nervousness served to confirm Welch's suspicion that Appellant may have killed Roberts, further warranting the decision to frisk Appellant for weapons. The trial judge properly overruled Appellant's motion to suppress the unspecified evidence allegedly obtained as a result of the *Terry* stop and frisk.

### III. CONFRONTATION.

As noted earlier, Ruth Caudill was charged with possession of a controlled substance in the first degree and possession of drug paraphernalia based upon the discovery of cocaine and drug paraphernalia in the motel room. Those charges were still pending at the time of Appellant's trial. Caudill's counsel informed the court that Caudill intended to invoke her Fifth Amendment privilege against self-incrimination if asked, in particular, about any activity relative to her pending drug charges. Appellant responded with a motion to suppress any testimony from Caudill, arguing that the Commonwealth could not call Caudill as a witness knowing that she intended to assert her Fifth Amendment privilege on cross-examination. Appellant asserts that the trial judge erred in overruling that motion. We disagree.

The substance of Caudill's testimony on direct examination has been summarized in Part I of this opinion. Caudill did not exercise her Fifth Amendment privilege in response to any question asked on direct examination. Her entire cross-examination was as follows:

Q: Let's back up to the morning of November the 6th. What did you do when you got up that day? Pardon?

A: We ate breakfast.

Q: And where did you eat breakfast at?

A: At the trailer.

Q: What did you have for breakfast?

A: Crackers and pork and beans [inaudible].

Q: And then what did you do?

A: We went to Carlene's and got a carton of cigarettes.

Q: What did you do before you went out to Carlene's?

A: I don't remember what we did.

Q: Would, perhaps, you have used some cocaine that morning, Ms. Caudill?

A: Your honor, could I talk with my lawyer before I answer that question?

Caudill never answered the question. Following an overnight recess, defense counsel informed the court:

Because of the problems we experienced yesterday, in reviewing the testimony and talking about what kind of effect it is going to have if we continue to ask her the questions that she takes the Fifth on, we've elected that we're not going to continue to cross-examine Ms. Caudill at this time.

Appellant asserts that Caudill's refusal to respond to cross-examination denied him his Constitutional right to be confronted by the witnesses against him. U.S. Const., amend. VI; Ky. Const. § 11. He relies primarily on the broad statement in *Clayton v. Commonwealth*, Ky., 786 S.W.2d 866 (1990) that "the prosecution may not call a witness knowing that the witness will invoke the Fifth Amendment immunity." *Id.* at 868, *citing Commonwealth v. Brown*, Ky., 619 S.W.2d 699, 703–04 (1981), *overruled on other grounds by Murphy v. Commonwealth*, Ky., 652 S.W.2d 69 (1983); *see also Marlowe v. Commonwealth*, Ky., 709 S.W.2d 424, 428–29 (1986); *Commonwealth v. Blincoe*, Ky.

App., 34 S.W.3d 822, 825 (2000). However, both our own and federal case law reveals only one circumstance in which a witness should *a priori* be precluded from taking the stand, *i.e.,* when the witness is called "for the *purpose* of extracting from him a claim of privilege against self-incrimination," *Brown, supra,* at 704 (emphasis added), or so that the prosecutor could introduce as a prior inconsistent statement his prior out-of-court statement inculpating the defendant. *Id.* at 703–04; *Douglas v. Alabama,* 380 U.S. 415, 416–20, 85 S.Ct. 1074, 1075–77, 13 L.Ed.2d 934 (1965).

 In contrast, a witness who, as here, will testify as to some matters but not as to others should ordinarily be allowed to take the stand. *Combs v. Commonwealth,* Ky., 74 S.W.3d 738, 742–43, 745 (2002) (noting that trial court should not have "treated [the witness's] invocation of the privilege against self-incrimination as an 'all-or-nothing' decision that barred the witness from testifying at all."). If the prosecution witness refuses to answer questions on cross-examination, the defendant's proper remedy is a motion to strike all or part of the witness's direct testimony. *See Combs, supra,* at 744; *United States v. Curry,* 993 F.2d 43, 45 (4th Cir. 1993); *United States v. Berrio–Londono,* 946 F.2d 158, 159–61 (1st Cir.1991); *United States v. Zapata,* 871 F.2d 616, 623 (7th Cir.1989); *United States v. Gullett,* 713 F.2d 1203, 1208–09 (6th Cir.1983); *United States v. Humphrey,* 696 F.2d 72, 75 (8th Cir.1982). The trial court's decision whether to strike all or part of the witness's testimony is reviewed for abuse of discretion. *Combs, supra,* at 744.

Here, there was not even a motion to strike. Thus, the only issue preserved for appeal is whether Caudill should have been prevented from testifying at all. *Combs, supra,* held that the trial court erred by refusing to allow a *defense* witness to take the stand simply because the witness indicated that she would assert her Fifth Amendment privilege in response to certain questions related to a collateral issue.[4] *Id.* at 745–46. Although *Combs* dealt with the Compulsion Clause of the Sixth Amendment and this case implicates the Confrontation Clause, the same standards apply when a witness (whether called by the prosecution or defense) takes the stand intending to assert the privilege. *Clayton, supra,* at 868. The Sixth Amendment no more allows a defendant to keep a prosecution witness entirely off the stand than it allows the prosecution to keep a defense witness off the stand simply because that witness intends to invoke his or her Fifth Amendment privilege in response to some but not all questions. *See Combs, supra,* at 742–743 ("[a]lthough there are different constitutional concerns at stake" when confrontation as opposed to compulsory process rights are implicated, "prohibiting a witness from testifying or striking the entirety of a witness's testimony is a 'drastic remedy not lightly invoked'") (quotation omitted); *Zapata, supra,* at 623 ("the defendant's confrontation right may be restricted by a witness' invocation of his right against self-incrimination guaranteed by the fifth amendment."); *Gullett, supra,* at 1208 ("the defendant's right to discredit a prosecution witness on cross-examination cannot overcome the witness' privilege against self-incrimination, if properly asserted.").

 Even if a motion to strike is made, it pertains only to testimony relevant to

4. The witness was called to support the defendant's alibi that she was at a department store at the time she was supposedly selling controlled substances. The Commonwealth wanted to ask the witness whether she had stolen merchandise from the store on the same occasion.

the issue concerning which the privilege was asserted. *Combs, supra,* at 746; *Humphrey, supra,* at 75. Thus, a witness's direct testimony generally will not be stricken when the defendant is merely precluded from attacking that witness's credibility. *E.g., Curry, supra,* at 45 (witness refused to say when he last dealt drugs); *Berrio–Londono, supra,* at 161 (prosecution witness refused to testify about prior drug transactions); *Zapata, supra,* at 624 (prosecution witness refused to testify about prior criminal activity and cocaine trafficking); *Gullett, supra,* at 1209 (prosecution witness refused to name people he had bribed).

██ Here, defense counsel did not attempt to cross-examine Caudill about the substance of her testimony, and Caudill invoked her Fifth Amendment privilege only when asked whether she had used cocaine on the morning of November 6th, an issue only marginally relevant to her credibility as a witness.

## IV. *MIRANDA* ISSUE.

Appellant moved to suppress the statements he made to his brother, Ronnie Adkison, as being in violation of *Miranda v. Arizona, supra.* Adkison testified at the suppression hearing that he was advised by their mother soon after Appellant's arrest that Roberts had been murdered, that Appellant was a suspect, and that Appellant was being held in jail on a cocaine charge. Adkison was concerned not only about his brother but about his family and their reputation. Adkison, himself, was an employee of the Department for Juvenile Justice. Thus, he decided to talk to Appellant and, if the murder accusation proved true, urge his brother to confess and seek a favorable plea bargain.

Adkison encountered Detective Welch at the Pike County Attorney's office and informed Welch of his intentions. Welch explained to Adkison that Welch could not interview Appellant because Appellant had invoked his *Miranda* rights, but that Adkison could do as he wished. Adkison then inquired as to whether he could inform Welch of the results of his conversation with Appellant. Welch stated that he would listen to any information Adkison provided, but stressed that Adkison was under no obligation to report anything to him. Adkison talked with Appellant in the Pike County Jail on November 8, 1999, and encouraged him to take responsibility for his actions, sparing the family the anguish of not knowing for sure whether he was guilty. In response, Appellant made the self-inculpatory statements that "I might have done it," and "if I done it, I deserve to die," and for Adkison "not to hold it against Ruth." Adkison subsequently informed Welch of those statements.

It is undisputed that Appellant was in police custody and had invoked his *Miranda* rights at the time the statements were made. Appellant contends that his brother was acting as an "agent of the police" during the jailhouse interrogation and, therefore, obtained his statements in violation of his Fifth and Sixth Amendment rights. We disagree.

It is well-established that only "state action" implicates a defendant's rights under the Fifth and Sixth Amendments of the United States Constitution and Section Eleven of the Constitution of Kentucky. *Colorado v. Connelly,* 479 U.S. 157, 164, 107 S.Ct. 515, 520, 93 L.Ed.2d 473 (1986); *Fields v. Commonwealth,* Ky., 12 S.W.3d 275, 283 (2000); *Mills v. Commonwealth,* Ky., 996 S.W.2d 473, 481 (1999); *Commonwealth v. Cooper,* Ky., 899 S.W.2d 75, 76–77 (1995). As the United States Supreme Court has explained, "[t]he most outrageous behavior by a private party seeking to secure evidence against a defendant does not make that evidence inadmissible

under the Due Process Clause." *Connelly, supra* at 166, 107 S.Ct. at 521. Indeed, *Miranda,* itself, was concerned only with "custodial interrogation," which "means 'questioning initiated by law enforcement officers after a person has been taken into custody.'" *Illinois v. Perkins,* 496 U.S. 292, 296, 110 S.Ct. 2394, 2397, 110 L.Ed.2d 243 (1990), *quoting Miranda, supra,* at 444, 86 S.Ct. at 1612; *see Hood v. Commonwealth,* Ky., 448 S.W.2d 388, 390–91 (1969) (*Miranda* does not apply to a citizen's arrest).

▬ Questioning by a party who is not a law enforcement officer may constitute a "custodial interrogation" (which entails state action) in two primary circumstances. The first is when the private entity is operating in accordance with a court order or governmental regulation and is thereby properly viewed as a "state actor." For example, in *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), an interrogation conducted by a court-appointed competency psychiatrist at the county jail was held to be "a phase of the adversary system," and therefore implicated the defendant's *Miranda* rights. *Id.* at 467, 101 S.Ct. at 1875. *See also Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 614–16, 109 S.Ct. 1402, 1412, 103 L.Ed.2d 639 (1989) (holding that heavy government regulation transformed the private railway's drug testing into a "search" for purposes of the Fourth Amendment). Adkison's conversation with his brother was neither pursuant to a court order nor in accordance with a governmental regulation.

▬ The second circumstance occurs when the government otherwise "exercised such coercive power or such significant encouragement that it is responsible for [the private party's] conduct." *United States v. Garlock,* 19 F.3d 441, 443 (8th Cir.1994) (quotation omitted). However,

the trial judge was entitled to believe the testimonies of Adkison and Welch that Welch neither "coerced" nor "significantly encouraged" Adkison to interrogate Appellant. *Id.* Both testified that Adkison approached Welch and advised him of his preexisting intention to question his brother about the murder of Roberts. Adkison expressed his rationale in the suppression hearing as follows:

> Being real upset about the whole situation, and, I just felt that I needed to do something to kind of protect our family and help him. You know, we have been raised in our family that if you do something wrong, we felt that you own up to it, and just be responsible for your actions.... I thought that he may be guilty of this crime.... And I thought well, if I go talk to him, he'll listen to me, because he usually does. And if he done it, he'll admit to it and get a plea.

Adkison's expressed goals were divorced from any law enforcement purpose. His motive was to protect his family's reputation, encourage his brother to live up to the values they had been taught, and help his brother obtain a favorable plea bargain. Thus, police conduct was in no way "causally related to the confession." *Connelly, supra,* at 164, 107 S.Ct. at 520.

It is immaterial to this analysis that Welch knew of Adkison's purpose and did not discourage him. *See Arizona v. Mauro,* 481 U.S. 520, 529, 107 S.Ct. 1931, 1936, 95 L.Ed.2d 458 (1987) ("Officers do not interrogate a suspect simply by hoping that he will incriminate himself."). Welch was not required to bar the jailhouse doors simply because he knew that a member of Appellant's family intended to induce him to confess. And, when Adkison expressed his desire to share information relevant to the murder investigation, Welch was not required to refuse to listen. If any coercion occurred here, it was applied by Ap-

pellant's own brother, not the police. *Snethen v. Nix,* 885 F.2d 456, 459–60 (8th Cir.1989) (no *Miranda* violation when defendant's confession was coerced by his mother, not police).

It is also immaterial that Adkison was an employee of the Department of Judicial Justice. *See* 1 W. LaFave and J. Israel, *Criminal Procedure* § 6.10(c) at 542 (1984) ("*Miranda* does not inevitably apply whenever questions are asked in a custodial setting by a government employee."). Adkison did not believe that it was, and it was not, his responsibility to assist in a non-juvenile homicide investigation; and, in fact, he was advised by Welch that he was under no obligation to report the results of the conversation.

Finally, the Fifth Amendment does not protect a defendant against interrogation by an undercover law enforcement agent unless the defendant is aware of his interrogator's status. *Illinois v. Perkins, supra,* at 296–97, 110 S.Ct. at 2397; *United States v. Cope,* 312 F.3d 757, 773 (6th Cir.2002) ("speaking with undercover government informants while incarcerated does not create a coercive atmosphere, and thus does not implicate the Self–Incrimination Clause of the Fifth Amendment."). "It is the premise of *Miranda* that the danger of coercion results from the interaction of custody and official interrogation.... [B]ut where a suspect does not know that he is conversing with a government agent, these pressures do not exist." 496 U.S. at 297, 110 S.Ct. at 2397. Even if Adkison had been a police agent, he would have been, at best, the functional equivalent of an undercover informant. There was no evidence that Appellant subjectively believed that Adkison was questioning him on behalf of law enforcement officials. Thus, even if Adkison had been a law enforcement agent, the Fifth Amend-

ment would not have precluded the admission of Appellant's statements.

## V. OTHER CRIMES, WRONGS, OR ACTS.

Appellant asserts that the trial court should have granted his motion to suppress Caudill's testimony that when Appellant returned to the mobile home on the evening of November 6th, he brought with him a quantity of cocaine, and Welch's testimony that (1) crack cocaine and drug paraphernalia were found in Appellant's motel room; (2) Appellant was operating a motor vehicle with a suspended operator's license; (3) Appellant attempted to conceal his identity from Welch by giving a false name and address when questioned in the motel parking lot; and (4) Appellant's excuse for trying to conceal his identity was that he thought the police were after him "because of drugs." Appellant characterizes all of this testimony as improper character evidence admitted in violation of KRE 404(b). We disagree.

KRE 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person *in order to show action in conformity therewith.* It may, however, be admissible:

(1) If offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident; or

(2) If so inextricably intertwined with other evidence essential to the case that separation of the two (2) could not be accomplished without serious adverse effect on the offering party.

(Emphasis added.)

Evidence of drug use is not probative of a propensity to commit homicide, robbery, or burglary, and this evidence was not

introduced for that purpose. *Cf. Springer v. Commonwealth*, Ky., 998 S.W.2d 439, 449 (1999) (sexual immorality is not probative of a propensity to commit homicide). Instead, evidence of Appellant's cocaine possession and of his fear of the police "because of drugs" was relevant to prove a motive for the homicide, robbery, and burglary, a purpose explicitly authorized by KRE 404(b)(1).

■ Evidence of a drug habit, along with evidence of insufficient funds to support that habit, is relevant to show a motive to commit a crime in order to gain money to buy drugs. *United States v. Miranda*, 986 F.2d 1283, 1285 (9th Cir. 1993) (admitting evidence of defendant's drug habit to show motive to commit bank robbery); *United States v. Kadouh*, 768 F.2d 20, 21 (1st Cir.1985) (admitting evidence of unemployed defendant's cocaine use to show motive to engage in drug trafficking); *United States v. Cyphers*, 553 F.2d 1064, 1069–70 (7th Cir.1977) (admitting evidence of defendant's heroin purchase shortly after robbery to show motive); *see also Young v. Commonwealth*, Ky., 50 S.W.3d 148, 168 (2001) (admitting evidence that defendant had "shorted" victim in prior cocaine transaction to show motive to kill); *Hutchison v. Bell*, 303 F.3d 720, 751 (6th Cir.2002) (allowing prosecutor to argue that defendant's drug activity was relevant to motive to commit murder). Caudill testified that she was unemployed and that Appellant worked only "on and off." The descriptions of their residence indicated that they lived in abject poverty. Yet, when Appellant returned to the mobile home on the evening of November 6th, he had a quantity of cocaine and enough money to pay for a motel room, which a jury could reasonably believe was a fruit of the crime. A jury could also reasonably believe that Appellant and Caudill purchased more cocaine during their temporary absence from the motel room on November 7th, and that the cocaine found by Welch and the other officers during their search of the room had been purchased during that absence. Thus, the trial court did not abuse its discretion by admitting this evidence as circumstantial proof of both motive and possession of the fruits of the crime.

■ Evidence that Appellant was driving on a suspended license and gave Welch a false name and address similarly did not violate KRE 404(b) because, again, neither of these "other wrongs" is probative of a propensity to commit homicide, robbery, or burglary, nor was introduced for that purpose. KRE 404(b)(2) allows the Commonwealth to present a complete, unfragmented picture of the crime and investigation. Robert G. Lawson, *Kentucky Evidence Law Handbook* § 2.25 at 96 (3d ed. Michie 1993). Welch testified that Appellant explained his presence on Roberts's property on the night of the murder by claiming he had gone there to evade a police cruiser because his driver's license had been suspended. Thus, the suspended license evidence was inextricably intertwined with Appellant's explanation of his presence on Roberts's property on the night of the murder.

Evidence that Appellant gave Welch a false name and address was probative of Appellant's consciousness of guilt. *See United States v. Ramirez–Jiminez*, 967 F.2d 1321, 1327 (9th Cir.1992) (defendant's giving false name to arresting officers was admissible "to flesh out the circumstances surrounding the crime with which the defendant has been charged" and was "probative of his consciousness that his conduct was illegal."); *cf. Tamme v. Commonwealth*, Ky., 973 S.W.2d 13, 29–32 (1998) (attempted spoliation of evidence is relevant as evidence inconsistent with innocence).

## VI. ALLEGED INFLAMMATORY EVIDENCE.

Appellant contends that the trial court improperly admitted evidence that served only to glorify the victim, specifically (1) a picture of Roberts alive with Appellant's mother and Appellant taken when Appellant was a child and living on Roberts's property; (2) a picture of Roberts alive with one of his grandsons; (3) testimony regarding Roberts' good health; (4) testimony about the emotional state of the victim's family after the homicide; and (5) comments by the Commonwealth during its opening statement that referred to Roberts as a "pillar in the community" and to the fact that he had three grandchildren. Although objections were registered only with respect to the first three issues, Appellant contends that the combined effect of all of this evidence was to glorify the victim, thereby arouse the sympathy of the jury, and, thus, deprive him of a fair trial. We disagree.

■■■■ "[W]e have held many times that life photographs and testimony concerning a victim are admissible to remind 'the jury that the victim was once a living person and not just a statistic.'" *Love v. Commonwealth*, Ky., 55 S.W.3d 816, 827 (2001), *quoting Templeman v. Commonwealth*, Ky., 785 S.W.2d 259, 261 (1990). *See also Talbott v. Commonwealth*, Ky., 968 S.W.2d 76, 86 (1998); *Bussell v. Commonwealth*, Ky., 882 S.W.2d 111, 113 (1994); *McQueen v. Commonwealth*, Ky., 669 S.W.2d 519, 523 (1984). The testimony and pictures presented here were admissible for this purpose. The picture of Roberts with Appellant as a child was also probative of the long-term relationship between Roberts and Appellant, tending to prove that Roberts would have known Appellant well

enough to have unlocked his door for Appellant while in a state of undress.

■■■■ Appellant next contends that the trial court improperly admitted three[5] inflammatory pictures of the victim's corpse, including a gruesome picture showing large holes in the back of his skull. Again, we disagree. Because the Commonwealth must prove the *corpus delicti*, photographs that are probative of the nature of the injuries inflicted are not excluded unless they are so inflammatory that their probative value is substantially outweighed by their prejudicial effect. KRE 403. Thus, a photograph of the crime scene "does not become inadmissible simply because it is gruesome and the crime is heinous." *Funk v. Commonwealth*, Ky., 842 S.W.2d 476, 479 (1992). *See Woodall v. Commonwealth*, Ky., 63 S.W.3d 104, 130 (2001); *Davis v. Commonwealth*, Ky., 967 S.W.2d 574, 579 (1998); *Brown v. Commonwealth*, Ky., 934 S.W.2d 242, 248 (1996); *Epperson v. Commonwealth*, Ky., 809 S.W.2d 835, 843 (1990); *Brown v. Commonwealth*, Ky., 558 S.W.2d 599, 605 (1977); *Poe v. Commonwealth*, Ky., 301 S.W.2d 900, 902 (1957).

> The rule prohibiting the exhibition of inflammatory evidence to a jury does not preclude the revelation of the true facts surrounding the commission of a crime when these facts are relevant and necessary. Were the rule otherwise, the state would be precluded from proving the commission of a crime that is by nature heinous and repulsive.

*Salisbury v. Commonwealth*, Ky., 417 S.W.2d 244, 246 (1967).

The cases cited by Appellant are inapposite and only exemplify the primary exception to the rule, *i.e.*, "when the condition of the body has been materially altered by

---

**5.** Appellant objected to two of four photographs depicting the condition of Roberts's body. The trial court sustained Appellant's objection as to one photograph.

mutilation, autopsy, decomposition or other extraneous causes, not related to the commission of the crime, so that the pictures tend to arouse passion and appall the viewer." *Clark v. Commonwealth*, Ky., 833 S.W.2d 793, 794 (1991); *Holland v. Commonwealth*, Ky., 703 S.W.2d 876, 879–80 (1985) (animal mutilation). Here, however, the admittedly gruesome condition of the victim's body was caused solely by the blows inflicted during the commission of the crime. Thus, although the crime was heinous, the pictures were relevant and admissible, *Walker v. Commonwealth*, Ky., 561 S.W.2d 656, 659 (1977), and the trial judge did not abuse his discretion in determining that their probative value was not substantially outweighed by their prejudicial effect. *Commonwealth v. English*, Ky., 993 S.W.2d 941, 945 (1999).

## VII. ALLEGED JUROR MISCONDUCT.

During voir dire, Juror No. 66 advised that she was Roberts's neighbor, that she had gone to school and rode the bus with Roberts's daughter, and knew some of the other witnesses in the case. She assured the court that her relationship with these witnesses would not affect her partiality and that, if she voted to acquit Appellant, it would not cause her a problem when she next encountered one of the witnesses, including the victim's daughter. Appellant does not claim that Juror No. 66 should have been excused for cause on the basis of these disclosures.

■ However, at the close of the evidence, defense counsel advised the trial judge that she "had been informed" that the juror "may have lied" about her relationship with Roberts's daughter. Defense counsel claimed to have "been informed that their children play on the same ball team and that they are, in fact, friends." On the basis of this proffer, defense counsel moved to excuse Juror No. 66 as the alternate. The trial court overruled the motion and Juror No. 66 participated in the jury's deliberations and agreed to the verdicts rendered. We review a trial court's decision on whether to excuse a juror for cause for abuse of discretion. *Pendleton v. Commonwealth*, Ky., 83 S.W.3d 522, 527 (2002); *Sholler v. Commonwealth*, Ky., 969 S.W.2d 706, 708 (1998).

■ A motion to excuse a juror for cause ordinarily must be made during *voir dire*. *Pelfrey v. Commonwealth*, Ky., 842 S.W.2d 524, 526 (1992) (holding that an objection to a juror's implied bias was waived if not raised during *voir dire*). The trial court may permit a challenge after a juror has been accepted only when "good cause" is shown. RCr 9.36(3). For example, in *Paenitz v. Commonwealth*, Ky., 820 S.W.2d 480 (1991), a rape case, the juror admitted that she knew the prosecution's medical examiner because they swam together at the YWCA. *Id.* at 481. But when specifically asked whether she had any knowledge or information about the case, the juror concealed the fact that the medical examiner had discussed the case with her three days before trial. *Id.* This fact was not learned until, after the trial was concluded, the juror was seen giving the medical examiner a "thumbs up" sign—indicating that the juror had been an advocate for the prosecution in convicting the defendant. *Id.* We concluded that this was a "flagrant abuse of juror responsibility" that deprived the defendant of his constitutional right to a trial by an impartial jury. *Id.* Similarly, in *Randolph v. Commonwealth*, Ky., 716 S.W.2d 253 (1986), *overruling on other grounds recognized by Commonwealth v. Wolford*, Ky., 4 S.W.3d 534 (1999), we reversed because the Commonwealth's Attorney's secretary had remained silent when asked if she had

"any association" with the Commonwealth's Attorney. *Id.* at 255.

■ To obtain a new trial because of juror mendacity, "a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire,* and then further show that a correct response would have provided a valid basis for a challenge for cause." *McDonough Power Equip., Inc. v. Greenwood,* 464 U.S. 548, 556, 104 S.Ct. 845, 850, 78 L.Ed.2d 663 (1984); *see also Anderson v. Commonwealth,* Ky., 864 S.W.2d 909, 911–12 (1993) (reversing when juror "concealed vital information on voir dire, information which may have justified a challenge for cause in and of itself on grounds of implied bias").

■ Appellant made no such demonstration here. The record does not reflect (1) any evidence offered to substantiate defense counsel's allegations; or (2) any material question that the juror failed to answer honestly. *See Key v. Commonwealth,* Ky.App., 840 S.W.2d 827, 830 (1992) (affirming when defendant failed to elicit testimony from juror in question and only evidence offered showed nothing more than speculation that juror was biased); *Polk v. Commonwealth,* Ky.App., 574 S.W.2d 335, 337 (1978) (affirming when defendant failed to offer evidence of actual bias); *see also Pinkston v. Griffith,* Ky. App., 730 S.W.2d 948, 950 (1987) (affirming despite juror's false answer on qualification form when no prejudice was shown). Even if defense counsel's proffer had been proven, it is not clear that such would have required the juror's excusal for cause. *See Copley v. Commonwealth,* Ky., 854 S.W.2d 748, 750 (1993); (no bias even though juror was a fellow employee of the victim); *Derossett v. Commonwealth,* Ky., 867 S.W.2d 195, 197 (1993) (no bias though juror lived in neighborhood of crime scene and visited it following incident); *Sanders v. Commonwealth,* Ky., 801 S.W.2d 665, 669 (1990) (no bias though juror worked with victim's spouse). Thus, the trial judge did not abuse his discretion by refusing to excuse Juror No. 66 at the close of the evidence.

Accordingly, the judgment of conviction and the sentences imposed by the Pike Circuit Court are affirmed.

All concur.