RENDERED: APRIL 11, 2025; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-1121-ME

S.S.      APPELLANT

v.      APPEAL FROM MADISON CIRCUIT COURT
HONORABLE NORA J. SHEPHERD, JUDGE
ACTION NO. 22-AD-00087

A.L.B., A CHILD; CABINET FOR
HEALTH AND FAMILY SERVICES,
COMMONWEALTH OF KENTUCKY;
AND J.F.C.      APPELLEES

AND

NO. 2024-CA-1124-ME

S.S.      APPELLANT

v.      APPEAL FROM MADISON CIRCUIT COURT
HONORABLE NORA J. SHEPHERD, JUDGE
ACTION NO. 22-AD-00088

CABINET FOR HEALTH AND
FAMILY SERVICES,
COMMONWEALTH OF KENTUCKY;
J.F.C.; AND J.W.B., A CHILD      APPELLEES

## OPINION
## AFFIRMING

** ** ** ** **

BEFORE: ACREE, COMBS, AND ECKERLE, JUDGES.

ECKERLE, JUDGE: S.S. ("Father") appeals from findings of fact, conclusions of law, and orders of the Madison Family Court terminating his parental rights to his two children. We conclude that, contrary to Father's arguments, there was clear and convincing evidence supporting the Family Court's statutory findings for termination. We further conclude that, while the Family Court should not have compelled Father's testimony after he asserted his Fifth Amendment rights, the Family Court's stricture on that testimony neither implicated Father's rights against self-incrimination in fact nor was determinative of the outcome of this proceeding. Hence, we affirm.

A.L.B. and J.W.B. ("Children") are twin boys born to J.F.C. ("Mother") in August of 2017 while she was incarcerated in South Carolina. Mother identified Father on the birth certificates as the biological father of Children. His paternity of Children was later confirmed through genetic testing.

The South Carolina Department of Social Services removed the Children from Mother's custody at birth due to her imprisonment. After initially placing them with foster parents, they later reunited them with their paternal

grandmother with whom Father resided. A South Carolina court granted supervised visitation to both Father and Mother.

In August of 2018, approximately one year after Children's birth, Father was arrested on drug-related charges. While released on bond, Father moved out of his mother's house but still retained contact with Children. Father was thereafter convicted and incarcerated for several years. During that time, Mother was released from her imprisonment. She moved with Children from South Carolina to Kentucky.

In February of 2021, the Cabinet for Health and Family Services ("the Cabinet") removed Children from Mother's custody and filed cases of dependency/neglect/abuse ("DNA") on their behalf. The Family Court found Children to be abused or neglected and placed them in the custody of the Cabinet. Father contacted the Cabinet, stipulated to dependency, and signed a case plan.

On August 2, 2022, the Cabinet filed petitions to terminate Father's and Mother's parental rights to Children.[1] The Family Court appointed a guardian *ad litem* ("GAL") for Children. Because both parents were incarcerated at that time, the Family Court also appointed GALs for them. Although Father was released from custody in October 2022, several months later, in March of 2023,

---

[1] The Cabinet also sought termination of Mother's parental rights to a third child. However, a different person is the father of that child, and that matter is not part of this appeal.

Father was arrested again on Federal charges in South Carolina. At the time of the hearing on June 13, 2024, both Father and Mother were still incarcerated. Mother agreed to a voluntary termination of her parental rights.

At the hearing, the Family Court took judicial notice of the records from the DNA actions and the criminal records relating to Mother's conviction. Notably, Mother was previously convicted for abusing and assaulting Children, for which she was sentenced to 30-years' imprisonment. The Family Court also briefly recessed the hearing to review the DNA files. In addition, the Cabinet introduced applicable records from the removal proceedings in South Carolina.

The Cabinet's caseworker, Travis Hacker, testified about the Cabinet's history with the family from the time Children were removed from Mother in 2021. Hacker testified that Father maintained only sporadic contact with the Cabinet before being arrested. Father has provided no support for Children during their lives and had no contact with them since his arrest in 2019. Hacker testified that Father did not show any compliance with his case plan and failed to maintain consistent contact with the Cabinet.

The Cabinet next called Father as a witness. Father appeared at the hearing remotely from South Carolina. Father objected, invoking his privilege against self-incrimination under the Fifth Amendment. The Family Court overruled the objection, concluding that Father's testimony regarding this matter

would not implicate his self-incrimination rights on unrelated, collateral matters. Nonetheless, it limited the inquiry and considered those rights on a question-by-question basis, sustaining objections to many. During his testimony, Father presented evidence of completion of several programs during his earlier incarceration.

At the conclusion of the hearing, the Family Court found that the Cabinet had sustained its burden of proof for termination of Father's parental rights to Children. The Family Court concluded that Father had abandoned Children, and there is no reasonable expectation of improvement in the foreseeable future based on the following: Father's extended absences from Children's lives; his failures to provide support for Children and to make an effort on working his case plan even when he was not incarcerated; and his ongoing criminal lifestyle. On July 9, 2024, the Family Court entered written findings of fact, conclusions of law, and an order terminating Father's parental rights to Children.

Thereafter, Father filed a timely motion to modify the findings of fact to correct certain clerical mistakes and misstatements of fact. Specifically, the Family Court's findings incorrectly stated that Father's counsel had requested a continuance based on Father's pending charges and rights against self-incrimination. Father pointed out that the objection was to the Cabinet's calling of him as a witness. Father also requested that the record include certificates showing

-5-

the efforts he had made while incarcerated.  The Family Court granted the modifications without objection from the Cabinet.  Father now appeals.  Additional facts will be set forth below as necessary.

Kentucky Revised Statute ("KRS") 625.090 sets out a four-part test for involuntary termination of parental rights:  (1) was the child abused or neglected as defined in KRS 600.020(1); (2) did the Cabinet file "a petition with the court pursuant to KRS 620.180 or 625.050;" (3) was termination of the parental rights in the child's best interests; and (4) was at least one of the enumerated termination grounds of KRS 625.090(2)(a)-(k) in existence?  *See also Cabinet for Health and Family Services v. K.H.*, 423 S.W.3d 204, 209 (Ky. 2014).  Because termination of parental rights involves a fundamental, liberty interest, the statutory findings must be supported by clear and convincing evidence.  *Id.* at 209.  "Clear and convincing proof does not necessarily mean uncontradicted proof.  It is sufficient if there is proof of a probative and substantial nature carrying the weight of evidence sufficient to convince ordinarily prudent-minded people."  *Cabinet for Health & Fam. Servs. v. K.S.*, 585 S.W.3d 202, 209 (Ky. 2019) (quoting *M.P.S. v. Cabinet for Human Resources*, 979 S.W.2d 114, 117 (Ky. App. 1998)); *see also R.M. v. Cabinet for Health & Fam. Servs.*, 620 S.W.3d 32, 37 (Ky. 2021).

This Court reviews a Family Court's factual findings pursuant to the standard of clear error.  Kentucky Rule of Civil Procedure ("CR") 52.01; *see also*

*M.E.C. v. Commonwealth, Cabinet for Health & Fam. Servs.*, 254 S.W.3d 846, 850 (Ky. App. 2008). Appellate review of the decision to terminate parental rights under the clear error standard affords great deference to a family court's findings and permits a family court "wide discretion in terminating parental rights." *K.H.*, 423 S.W.3d at 211. When the "facts are not seriously disputed[,]" the "appellate courts are disinclined to disturb trial-court findings[.]" *R.M.*, 620 S.W.3d at 38 (footnotes and citations omitted).

Here, Father does not challenge the Family Court's finding that he neglected Children. KRS 625.090(1)(a)2. Similarly, Father concedes that the Cabinet filed a termination petition. KRS 625.090(1)(b). And Father does not dispute the Family Court's findings of the best interests of Children.

Rather, Father disputes the Family Court's findings under KRS 625.090(2). Father first takes issue with the Family Court's finding under KRS 625.090(2)(a) that he abandoned the Children. "Generally, abandonment is demonstrated by facts or circumstances that evince a settled purpose to forego all parental duties and relinquish all parental claims to the child." *J.H. v. Cabinet for Human Resources*, 704 S.W.2d 661, 663 (Ky. App. 1985) (quoting *O.S. v. C.F.*, 655 S.W.2d 32, 34 (Ky. App. 1983)). "Incarceration alone can never be construed as abandonment as a matter of law." *Id.*

However, this Court in *J.H.* further noted that "absence, voluntary or court-imposed, may be a factor to consider in determining whether the children have been neglected[.]" *Id.* at 664. Indeed, this Court ultimately concluded in that case that the parent's "violence" and "criminal lifestyle" resulted in his children being "substantially and continuously neglected." *Id.* This Court recently reiterated this holding in *A.R.D. v. Cabinet for Health and Family Services*, 606 S.W.3d 105, 110-11 (Ky. App. 2020). Similarly, in *Cabinet for Human Resources v. Rogeski*, 909 S.W.2d 660 (Ky. 1995), the Kentucky Supreme Court held that "[a]lthough incarceration for an isolated criminal offense may not constitute abandonment justifying termination of parental rights, incarceration is a factor to be considered[.]" *Id.* at 661.

As previously noted, Father was absent from Children's lives for extended periods while he was incarcerated. Even during the six-month period in 2022-2023 when he was not incarcerated, Father did not maintain contact with the Cabinet or work on his case plan. He also incurred additional, new criminal charges during that brief period. Although Father was involved with his Children prior to his first incarceration in 2019, he never had custody of or supported Children – financially or otherwise – at any point in their lives. Given this abundance of evidence, the Family Court did not clearly err in finding abandonment.

Father next challenges the Family Court's findings under KRS

625.090(2)(e) and (g), which provide as follows:

> (e) That the parent, for a period of not less than six (6) months, has continuously or repeatedly failed or refused to provide or has been substantially incapable of providing essential parental care and protection for the child and that there is no reasonable expectation of improvement in parental care and protection, considering the age of the child;
>
> . . .
>
> (g) That the parent, for reasons other than poverty alone, has continuously or repeatedly failed to provide or is incapable of providing essential food, clothing, shelter, medical care, or education reasonably necessary and available for the child's well-being and that there is no reasonable expectation of significant improvement in the parent's conduct in the immediately foreseeable future, considering the age of the child[.]

Father focuses on the Family Court's findings under these sections that there is no reason to expect improvement from him regarding his continued conduct. Father points to the evidence showing that he completed several programs during his prior incarceration, including his General Equivalency Degree, two work-related programs, and a parenting class. Father also notes that the Cabinet failed to renew his first case plan, and he contends that the Cabinet disregarded his attempts to contact it during the period that he was released from incarceration.

This issue necessarily leads to Father's other argument that the Family Court improperly compelled his testimony after he had invoked his Fifth Amendment rights. Father maintains that the Family Court improperly compelled him to testify regarding matters that might potentially affect his sentencing on the pending charges in another criminal case. He also asserts that he was prejudiced by the Family Court's ruling because his counsel was unable to cross-examine him after he had invoked the privilege.

We are necessarily concerned about a Family Court's compelling of testimony from a person with substantial, documented criminal cases and repeated incarceration who has raised the issue of his Fifth Amendment rights against self-incrimination. Absent a privilege, no person may refuse to be called as a witness. Kentucky Rule of Evidence ("KRE") 501. However, the Fifth Amendment of the United States Constitution and Section 11 of the Kentucky Constitution secure a privilege against self-incrimination. *Welch v. Commonwealth*, 149 S.W.3d 407, 410 (Ky. 2004). Moreover, the privilege protects a person from being forced to put forth evidence against himself and does not turn on the type of proceeding, but on the nature of the statement or admission and the exposure which it invites. *Id.* (citing *In re Gault*, 387 U.S. 1, 49, 87 S. Ct. 1428, 1455, 18 L. Ed. 2d 527 (1967)). Thus, the privilege "'can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory,' in which the witness

-10-

reasonably believes that the information sought, or discoverable as a result of his testimony, could be used in a subsequent state or federal criminal proceeding." *United States v. Balsys*, 524 U.S. 666, 672, 118 S. Ct. 2218, 2222, 141 L. Ed. 2d 575 (1998) (citations omitted).

Generally, the Commonwealth may not call a witness knowing that the witness will invoke a Fifth Amendment privilege. *Clayton v. Commonwealth*, 786 S.W.2d 866, 868 (Ky. 1990). Nevertheless, a witness who "will testify as to some matters but not as to others should ordinarily be allowed to take the stand." *Adkins v. Commonwealth*, 96 S.W.3d 779, 789 (Ky. 2003) (citing *Combs v. Commonwealth*, 74 S.W.3d 738, 742-43, 745 (Ky. 2002)). In this case, the Family Court concluded that the Cabinet's questions to Father did not involve any matters that could be used in a subsequent state or federal proceeding or that could realistically incriminate him in any manner.

In addition, the Family Court was also duly cautious and thus considered each question individually to ensure none of them infringed on Father's constitutional privilege. And for the most part, the questions asked only concerned Father's relationship with Children and his contact with the Cabinet during the relevant time period. The Cabinet asked narrow questions about the periods in which he had been incarcerated and the nature of the charges against him. The Cabinet was careful to refrain from asking any questions about the conduct leading

-11-

to those charges. Furthermore, the Family Court sustained several objections to questions that could have any potential for incriminating Father in criminal conduct.

Moreover, if a witness refuses to answer questions on cross-examination, the proper remedy is a motion to strike all or part of the witness's direct testimony.[2] *Adkins*, 96 S.W.3d at 789; *see also Combs*, 74 S.W.3d at 744. Father's counsel moved to strike Father's testimony at the close of proof, and the Family Court denied the motion. We review the Family Court's decision whether to strike all or part of a witness's testimony for abuse of discretion. *Id.*

Here, Father does not identify any specific prejudice from the Family Court's decision to compel him to testify as a witness. Thus, there is a hollowness to his complaints here. The remedy for the error in this case would have been to strike his testimony, which he clearly does not want. To the contrary, he

---

[2] At the conclusion of the June 13, 2024, hearing, the Family Court directed the Cabinet's counsel to draft the findings of fact, conclusions of law, and termination orders. The Family Court adopted the Cabinet's tendered findings, which included the misstatement that Father's counsel requested a continuance based on the assertion of his Fifth Amendment rights. The Family Court was within its discretion to adopt tendered findings unless doing so indicates that the decision-making process was not under the control of the judge. *Keith v. Keith*, 556 S.W.3d 10, 13-14 (Ky. App. 2018). At the August 5, 2024, hearing, the Cabinet's counsel conceded that this was a misstatement. Thereafter, on August 14, 2024, the Family Court entered a calendar order noting the correction. The Cabinet's appellate counsel does not acknowledge the correction and continues to assert, incorrectly, that Father's counsel requested a continuance. However, on appeal, Father's counsel argues that the Family Court should have postponed the hearing until his pending criminal matter was settled. Since the issue was not presented to the Family Court, we conclude that Father waived any request to continue the proceedings. And he will not be heard on this ground on appeal.

specifically relies on his own testimony to counter the Family Court's finding concerning any reasonable expectation of improvement. Also, a remedy could have involved the granting of a continuance – which Father's counsel intentionally declined to request.

We recognize that these circumstances presented a difficult situation for both the Family Court and Father. The privilege against self-incrimination is of paramount importance and not to be disregarded. Courts must always be vigilant about safeguarding and protecting it. The decision to terminate one's parental rights is also an extremely important and heavy determination. It has been often compared to a civil death penalty. Thus, Courts are and should be inclined to hear as much relevant evidence as possible.

In this case, there could have been a struggle to safeguard constitutional protections and family rights contemporaneously. But in reality, it did not occur. The Family Court did not allow a competition of safeguards or protections. Instead, the Family Court carefully considered his assertion of the privilege as to each question, concluded that most of the questions did not require Father to incriminate himself, and sustained objections to those that even had a remote possibility of doing so. Thus, under the particular facts of this case, Father's Fifth Amendment protections were not infringed. Thus, this case does not warrant reversal as an outcome.

However, before leaving the issue of a parent's exercise of his Fifth Amendment rights in termination proceedings, we must emphasize the narrowness of our holding in this case. Lest our ruling be misconstrued, we believe that it would have been far better practice for the Family Court to sustain entirely Father's objection to testifying at the outset as a prophylactic measure to safeguard a crucial constitutional right. We stress that it is the Cabinet's burden to present clear and convincing evidence of the statutory factors supporting termination. It does not typically carry its burden by calling a parent as a witness to his own termination proceeding.

Here, the Family Court allowed the Cabinet to call Father; he offered only limited testimony in that his incarceration prevented him from contact with his Children at times; his testimony was collateral to any privileged information, which was not compelled; the Family Court sustained objections on privilege grounds preventing Father from actually incriminating himself; and there was no actual invasion of privileged matter. But we strongly warn against future attempts to compel such testimony from parents in these circumstances. And we note that the testimony obtained here was unnecessary to the final determination the Family Court was called upon to make about termination.

Under other circumstances, such as if the Family Court had used the compelled testimony as the sole grounds to grant termination, we would likely

-14-

reverse the decision and order the testimony sealed. However, the information gleaned here was entirely innocuous, unrelated, and extraneous to not only the exercise of Fifth Amendment rights, but also the termination of parental rights. To be clear, it is error for the Family Court to compel testimony of a parent under these circumstances; but it is harmless error due to the specific information given in this case – information Father himself considered important to his own arguments.

Important to our holding, Father's testimony alone is not determinative of whether there is a reasonable expectation of improvement in his conduct within the foreseeable future considering Children's ages. The statute does not require that a parent completely eradicate all problems immediately. *M.E.C.*, 254 S.W.3d at 855. But the statute "does require that the Cabinet prove by clear and convincing evidence that there is no reasonable expectation of improvement." *F.V. v. Commonwealth Cabinet for Health & Fam. Servs.*, 567 S.W.3d 597, 609 (Ky. App. 2018).

Much of Father's testimony focused on explaining his absence from Children's lives and his failure to follow through on his case plan. Father made some efforts to improve his situation during his first incarceration. The Cabinet did not present extensive evidence, but Hacker testified about the reunification services that the Cabinet offered to Father, as well as his failure to maintain contact

with the Cabinet. KRS 625.090(4). Father failed to follow up with the Cabinet after he was released, and instead engaged in alleged further criminality resulting in new charges during that period. While the outcome of Father's pending Federal charges is not in the record, the evidence presented at the hearing shows that he is facing a significant period of incarceration. And, at most, Father has only been involved in Children's lives for the 18-month period prior to his incarceration in 2019.

Finally, KRS 625.090(2) only required the Family Court to find "one (1) or more" of the listed grounds. Since the Family Court properly found abandonment, any reliance on Father's testimony to support the findings under KRS 625.090(2)(e) and (g) does not affect the outcome of this appeal. We would have so found without his testimony. Under the circumstances, we conclude that the Cabinet presented clear and convincing evidence that there is no reasonable expectation of improvement in Father's circumstances within the foreseeable future. In the absence of any other objection to the Family Court's findings, the Family Court did not clearly err in its findings or abuse its discretion in terminating Father's parental rights to Children.

Accordingly, we affirm the orders of the Madison Family Court terminating Father's parental rights to Children.

ALL CONCUR.


BRIEF FOR APPELLANT:

Emily M. Campbell
Winchester, Kentucky

BRIEF FOR APPELLEE CABINET
FOR HEALTH AND FAMILY
SERVICES, COMMONWEALTH OF
KENTUCKY:

Kevin Martz
Covington, Kentucky