Philip Alan **LICKLITER**, Appellant,

v.

**COMMONWEALTH of Kentucky,** Appellee.

No. 2002–SC–0487–MR.

Supreme Court of Kentucky.

Aug. 26, 2004.

Karen Maurer, Assistant Public Advocate, Department of Public Advocacy, Frankfort, Counsel for Appellant.

Gregory D. Stumbo, Attorney General of Kentucky, Samuel J. Floyd, Jr., Assistant Attorney General, John R. Tarter, Assistant Attorney General, Criminal Appellate Division, Office of the Attorney General, Frankfort, Counsel for Appellee.

WINTERSHEIMER, Justice.

This appeal is from a judgment based on a jury verdict which convicted Lickliter of murder and tampering with physical evidence. He was sentenced to a total of twenty-five years in prison.

The questions presented are whether Lickliter was entitled to instructions on voluntary intoxication, second-degree manslaughter and insanity; whether the trial judge properly denied the motion to suppress Lickliter's confession; whether testimony regarding the decomposition of the victim's body was reversible error; and whether reversible error occurred with respect to the jury instructions on reasonable doubt, first-degree manslaughter and other instructions.

Lickliter and the victim were together on an out of state truck-driving job. When Lickliter returned to Kentucky, the victim was no longer with him. About a week later, an individual happened upon the body of the victim in a wooded area near Tazewell, Tennessee. A forensic expert determined that the victim had been dead five to seven days when the body was found. A medical examiner concluded that the cause of death was two gunshot wounds, one to the chest and one to the abdomen. Two bullet holes were found in Lickliter's truck and a projectile was recovered from the cab.

Originally, Lickliter denied any wrongdoing, but during his third interview with police, he admitted killing the victim. He was charged with murder and tampering with physical evidence. Among other evidence, the written statement made by Lickliter was read at his trial. In that statement, Lickliter alleged that the victim threatened to kill him and his family. He stated that he was so afraid of the victim that when the victim fell asleep, he reached into the victim's bag, got out a gun and shot the victim. Lickliter stated that he did this between exits 100 and 104 on interstate 75, and that he threw the gun out of the truck somewhere near exit 63. He admitted leaving the body of the victim in the woods. It was noted that exits 100 to 104 on Interstate 75 are in Fayette County, Kentucky.

Testifying for the defense, a psychologist stated that he examined Lickliter and concluded that his extended use of amphetamines caused him to have paranoid and delusional thinking. He told the jury: "I believe that his mental condition was so severe at one point that he felt that his life and wife and his children were really threatened, that they could be killed and that he lacked what we call the capacity to control his behavior." A licensed clinical psychologist also testified and concluded that: "... Lickliter's judgment at that period of time was affected by and his behavior was affected by the symptoms that he had been experiencing including the hallucinations and delusions, and that that may well have had an effect upon his behavior at the time of the incident." The two experts did not give any opinion that the accused suffered from a mental illness as defined by the statute. Lickliter did not testify at trial.

The jury convicted Lickliter of murder and tampering with physical evidence. He was sentenced to twenty-five years and five years on the respective charges, said sentences to run concurrently for a total of twenty-five years in prison. This appeal followed.

## I. Instructions Denied

■ Lickliter argues that the trial judge erred when she refused to instruct the jury on the defense of voluntary intoxication, second-degree manslaughter and the defense of insanity. We disagree.

■ In order to justify an instruction on intoxication, there must be evidence that not only was the defendant drunk, but that he was so drunk that he did not know what he was doing. *Springer v. Commonwealth*, Ky., 998 S.W.2d 439 (1999). Voluntary intoxication is a defense if it negates the existence of an element of the offense. KRS 506.080(1). *See also* 1 Cooper, *Kentucky Instructions to Juries* (Criminal) § 11.30 (1999). Here, there was no evidence that Lickliter was intoxicated to the extent that his intoxication negated the element of intent with respect to the killing of the victim. Lickliter confessed to the police that he intentionally killed the victim. Although there was evidence that he was acting under a delusional state of mind, the fact remains that he killed the victim intentionally. Thus, the trial judge properly declined to instruct the jury on voluntary intoxication. Because Lickliter was not entitled to an instruction on the defense of intoxication, he was also not entitled to an instruction on the related offense of second-degree manslaughter. *See Fields v. Commonwealth*, Ky., 12 S.W.3d 275 (2000).

■ Nor was Lickliter entitled to an instruction on insanity. Pursuant to KRS 504.060(5), Insanity "means that, as a result of mental condition, lack of substantial capacity either to appreciate the criminality of one's conduct or to conform one's conduct to the requirements of law." The "mental condition" referred to in this definition, must be a mental illness or mental retardation. *See* 1 Cooper, *Kentucky Instructions to Juries* (Criminal) § 11.31 (1999). Drug addiction, by itself, is not a disease constituting or leading to "mental illness." *Commonwealth v. Tate*, Ky., 893 S.W.2d 368 (1995).

Here, there was evidence that Lickliter abused illegal drugs, but there was no evidence of mental illness. The supporting evidence presented by the two experts was not sufficient, when taken as a whole, for the jury to be given an insanity instruction. There was no possibility that the jury could infer a "reasonable probability" that the condition of insanity existed. *Cf. Cannon v. Commonwealth*, Ky., 777 S.W.2d 591 (1989). *See also Rogers v. Sullivan*, Ky., 410 S.W.2d 624 (1966).

The two defense experts did not give any opinion that Lickliter suffered from insanity as defined by KRS 504.060(5). At best, they recited only symptoms. Thus, Lickliter was not entitled to an insanity instruction and the trial judge properly rejected the requested instruction.

We recognize that Lickliter did present evidence that he killed the victim based on delusional thoughts, which manifested itself because of chronic abuse of methamphetamines. Nevertheless, under the current state of the law in Kentucky, there is no basis for either of the instructions sought by Lickliter. The legislature of this state has not expressed any intention that drug addiction arising from the voluntary ingestion of drugs, by itself, affords a defense to a criminal charge based on mental illness. *Tate, supra.* "Any action in this state to recognize voluntary drug addiction, standing alone, as a mental ill-

ness, is to be accomplished, if ever, by the legislature rather than by judicial decree." *Tate*, 893 S.W.2d at 372.

## II. Suppression

■ Next, Lickliter contends that the trial judge erred when she denied his motion to suppress evidence of his statement given to law enforcement officers. We disagree.

After conducting a suppression hearing, the trial judge entered her findings of facts and conclusions of law. According to those findings, the police interviewed Lickliter on August 26, 29 and 30, 2000. At the conclusion of the statement on August 29, there was discussion concerning the taking of a polygraph the next day. Lickliter claimed that he specifically asked to be provided an attorney as a condition of taking the polygraph. A law enforcement official, however, testified that he did not remember any condition imposed regarding their providing an attorney, but does remember that Lickliter said he was going to see his attorney the next day before he came in for the polygraph. Lickliter testified that he did go see his attorney that next day, but that it was his bankruptcy attorney and he did not intend to consult with him about the criminal matter.

The trial judge further found that on August 30, Lickliter was late for the scheduled polygraph so the police went to his home to see if he was still willing to take it. Lickliter agreed and he accompanied the police to their office. He signed a written consent to take the exam, which included statements regarding his right to counsel and to remain silent. Both officers testified that they had no memory of Lickliter requesting an attorney before taking the exam.

According to the findings of the trial judge, upon being advised of his test results, Lickliter requested a lawyer. At that point, officers stopped all questioning. The police officers stated that Lickliter was not held, not cuffed and was free to go. The two officers left the premises and Lickliter went outside the building and conferred with members of his family. Shortly thereafter, Lickliter relayed to the officers that he wanted to talk with them again.

The trial judge noted that an audio tape from the final interview was played during the suppression hearing and one of the officers can be heard stating at the beginning, "You (Lickliter) asked for an attorney after the polygraph and we stopped and it's been an hour or so and now we understand you now want to talk with us." Following that statement, a complete Miranda warning was read to Lickliter and he signed it. During this interview, Lickliter confessed to killing the victim.

Our review of the record demonstrates that the findings of the trial judge are supported by substantial evidence, and thus are conclusive. RCr 9.78. Further, the trial judge correctly concluded from the record that when Lickliter asked for counsel, questioning stopped until he himself initiated further communication and conversation. *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). She also correctly determined that Lickliter voluntarily and knowingly waived his right to remain silent and his right to have counsel present before making his confession. The trial judge did not err in denying the motion to suppress.

## III. Decomposed Body

■ Lickliter asserts that the failure to suppress repeated prejudicial testimony regarding the decomposition of the victim's body was reversible error. We disagree.

Before trial, defense counsel moved to preclude photographs of the victim's body

as well as testimony regarding the advanced state of decomposition. The trial judge granted the motion as to the photographs, but overruled the request to preclude the testimony. Thereafter, the witness who found the victim's body testified that it smelled and two doctors testified to the advanced state of decomposition, which included maggot activity.

 Lickliter cites no authority for the proposition that testimony regarding the decomposed body of a victim is admissible only under the standards for admissibility of photographs of such victims. Obviously, the testimony by the forensic experts as to the decomposition of the body is not at all like photographic evidence. Nevertheless, even under the same standard pertaining to photographs, it is well settled that such evidence is not inadmissible simply because it is gruesome and the crime scene is heinous. *Adkins v. Commonwealth*, Ky., 96 S.W.3d 779 (2003). Inflammatory evidence does not preclude the revelation of the true facts surrounding the commission of a crime when the facts are relevant and necessary. *Adkins, supra.*

 The testimony of the forensic experts was both relevant and admissible. The Commonwealth is required to establish each and every element of an offense beyond a reasonable doubt. *Brown v. Commonwealth*, Ky., 890 S.W.2d 286 (1994). Given the evidence of the defense concerning Lickliter's alleged delusions, the testimony by the forensic experts of the advanced state of decomposition was important to determine the approximate date of death. Thus, the Commonwealth was able to show that the time of death coincided with the time the victim was with Lickliter. There was no error in allowing testimony concerning the smell of the body. The trial judge did not err in ruling

that the complained of evidence was admissible.

## IV. Reasonable Doubt/EED

 Lickliter claims that reversible error occurred when the trial judge failed to instruct the jury on reasonable doubt as it applied to extreme emotional disturbance. He also asserts that the jury instruction on first-degree manslaughter did not include separate references to his defense of extreme emotional disturbance. Lickliter concedes that this issue is not preserved, but seeks review under RCr 10.26.

 The palpable error rule in RCr 10.26 is not a substitute for the requirement that a litigant must contemporaneously object to preserve an error for review. RCr 9.22. The general rule is that a party must make a proper objection to the trial judge and request a ruling on that objection, or the issue is waived. *See Commonwealth v. Pace*, Ky., 82 S.W.3d 894 (2002). *See also Bell v. Commonwealth*, Ky., 473 S.W.2d 820 (1971). An appellate court may consider an issue that was not preserved if it deems the error to be a "palpable" one which affected the defendant's "substantial rights" and resulted in "manifest injustice." RCr 10.26.

Considering all the circumstances, the failure of the presumption of innocence instruction to separately refer to extreme emotional disturbance in the manner of the specimen instruction found in *Commonwealth v. Hager*, Ky., 41 S.W.3d 828 (2001) was not palpable error. No error occurred with respect to the manslaughter instruction. *See Baze v. Commonwealth*, Ky., 965 S.W.2d 817 (1997), which held that it is error to require the Commonwealth to prove the presence of extreme emotional disturbance as an element of the offense of first-degree manslaughter.

## V. Other Instructions

Lickliter argues that reversible error occurred when the trial judge failed to instruct the jury on self-protection, imperfect self-protection, second-degree manslaughter and reckless homicide. We disagree.

We must observe that the original brief filed by Lickliter did not address this alleged error; it was raised for the first time during the oral argument. Appellate counsel admitted that she had made a conscious decision not to brief the issue, but stated that she decided to raise it after her review of the record in preparation for oral argument convinced her that she made a mistake in omitting the claim. Following that oral argument, this Court entered an order directing both sides to file a supplemental brief on the issue.

According to the statement Lickliter gave police, the victim had conveyed to him that he was a hit-man and that if he (Lickliter) told anyone, he (the victim) was going to kill him and his family. Lickliter claimed that after he and the victim left a truck stop in Waddy, Kentucky, the victim threatened him with a flashlight and accused him of telephoning his wife and warning her that he (the victim) was a killer. Lickliter recounted in his statement:

> We were on Interstate 75 South. The gun that he had been showing me was in (the victim's) bag, and I thought to myself that it could have as easily been it as the flashlight in his hand the next time. I was very scared of him at this time and didn't know what to do. About ten minutes later he laid down on the bottom bunk and went to sleep. Before he went to sleep he was still talking about killing people when he got back to Tazewell, and I believed him. If I hadn't shot him, I believe that he would have got home and you would have had five body bags, David. His bag was in the closet behind me. I reached back, opened it up and got the gun. We were still moving down the interstate. I turned myself around while I was driving, and I shot (the victim) two or three times. It was an automatic and I fired quick. I don't remember how he was laying. I was at exit 100 and 104. I was between them. This is south of Lexington on 75 South. I was terrified and I don't know if he moved or not. I threw the gun out around the exit at 63, on down the road.

KRS 503.050 provides in part:

(1) The use of physical force by a defendant upon another person is justifiable when the defendant believes that such force is necessary to protect himself *against the use or imminent use* of unlawful physical force by the other person. (emphasis added)

(2) The use of deadly force by a defendant upon another person is justifiable under subsection (1) only when the defendant believes that such force is necessary to protect himself against death, serious physical injury, kidnapping, or sexual intercourse compelled by force or threat.

The justification is also available when there is a mistaken belief in the existence of use or imminent use of unlawful physical force by another. KRS 503.120(1). "Imminent" is defined in KRS 503.010(3) as impending danger. The dictionary also lists "impending" as being synonymous with "imminent" and further defines it as, "About to occur at any moment." Webster's II New Riverside University Dictionary 611 (1984).

Here, it is abundantly clear from all the evidence that Lickliter never believed, mistaken or otherwise, that the threat was imminent. The evidence at trial was that

the victim was killed in Fayette County while he slept in the back of the truck. According to Lickliter's statement, he believed that the victim was going to use physical force against him when they got back to Tennessee, and only if he told anyone that the victim was a hired killer. There simply was no evidence that the physical force was imminent. To require any type of self-defense instruction under these circumstances would be ludicrous. The trial judge properly rejected all the requested instructions.

There was no violation of Lickliter's rights under either the federal or state constitution.

The judgment of conviction is affirmed.

COOPER, GRAVES and JOHNSTONE, JJ., concur.

STUMBO, J., dissents by separate opinion and is joined by LAMBERT, C.J. and KELLER, J.

STUMBO, Justice, dissenting.

I dissent from the majority opinion because I believe that Appellant was entitled to an insanity instruction due to his mental condition resulting from the chronic abuse of methamphetamine.

In *Commonwealth v. Tate,* Ky., 893 S.W.2d 368, 369 (1995), this Court held that drug addiction, by itself, did not constitute a mental illness for the purpose of pleading an insanity defense pursuant to KRS 504.020. *Tate* dealt with a defendant who committed robbery in order to obtain money for drugs so as to avoid the pain of withdrawal symptoms. The *Tate* court did not hold that the mental effects of prolonged and severe drug abuse could never form the basis of an insanity defense. The Court merely held that Tate did not introduce enough additional evidence of a mental condition that would cause his behavior to be substantially impaired. *Id.* at 372–

373. The Court specifically stated that "[i]n order for addiction to relieve an accused of criminal responsibility it must be proved that his addiction amounted to or caused mental illness or retardation." *Id.* at 372.

While not every drug addict would be entitled to an insanity instruction, Appellant presented two expert witnesses whose testimony effectively amounted to evidence that Appellant lacked the capacity to conform his conduct to the law. Dr. Shilling testified that Appellant suffered from paranoid and delusional thinking resulting from the extended use of amphetamines and that "his mental condition was so severe at one point that he felt that his life and his wife and his children were really threatened, that they could be killed and that he lacked what we call the capacity to control his behavior." Dr. Allen also testified that Appellant suffered from paranoid delusions and hallucinations, and that his behavior was likely affected by such symptoms, which were consistent with the chronic use of amphetamines. There was also other evidence depicting Appellant's bizarre behavior resulting from such delusional thoughts and hallucinations. The majority erroneously believes that this evidence is so scant that there "was no possibility that the jury could infer a 'reasonable probability' that the condition of insanity existed." Op., p. 68. I disagree. It is well settled that "the court is required to instruct on every state of the case reasonably deducible from the evidence." *Ragland v. Commonwealth,* Ky., 421 S.W.2d 79, 81 (1967). There was substantial evidence of Appellant's physiological and psychological abnormalities at the time of the crime to support an instruction on insanity, regardless of the cause of those infirmities.

This is not a novel concept. Many jurisdictions have long recognized that an ac-

cused may be absolved of criminal responsibility if found to be suffering from a mental illness caused by the long-term use of intoxicants (sometimes referred to as "settled insanity"). *See* 21 Am.Jur.2d *Criminal Law,* § 54 (2003); 22 C.J.S. *Criminal Law,* §§ 112–113 (1989). I believe that *Tate, supra,* does not preclude such a finding in the case at bar, and therefore, would reverse Appellant's conviction for failure to instruct the jury on the defense of insanity.

Additionally, the absence of an erroneous-belief-qualified self-protection instruction raises additional doubts in my mind about the reliability of the jury's Murder verdict. Despite having requested the instruction at trial, the issue was not briefed for the Court. Accordingly, I have some unresolved questions about it, *e.g.,* whether in the context of this case, Appellant would have been an "initial aggressor" for whom the self-protection justification would be unavailable, KRS 503.060(3), and/or whether Appellant's fears addressed themselves to his belief in a sufficiently *imminent* threat from the victim. *See* KRS 503.050(1). In order to resolve those questions and to determine whether the trial court's failure to give the requested instruction was error, we require a more thorough inquiry than the cursory one that occurred at oral argument in this case. Thus, instead of rendering an opinion that simply ignores the belatedly-raised allegation of error, the Court should delay rendition of this opinion and direct both parties to file simultaneously, within a short period of time, *e.g.* twenty (20) days, supplemental briefs of nor more than fifteen (15) pages addressing Appellant's tardily-presented claim. And then, after the supplemental briefs are filed, the Court should address the merits of the claim. Although the content of these supplemental briefs would not alter my bottom-line vote to reverse both of Appellant's convictions be-

cause the trial court erred in failing to instruct upon insanity, I would not be at all surprised to see a majority of the Court reverse Appellant's Murder conviction if we considered the merits of Appellant's self-protection claim.

LAMBERT, C.J., and KELLER, J., join this dissent.