# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

$\mathfrak{Supreme\ Court\ of\ Kentucky}$

2019-SC-000242-MR

DATE 7/9/20

WILLIAM MATTINGLY                                                APPELLANT

/Hutcheson/

ON APPEAL FROM JEFFERSON CIRCUIT COURT

V.        HONORABLE JUDITH E. MCDONALD-BURKMAN, JUDGE

NO. 15-CR-003102

COMMONWEALTH OF KENTUCKY                                          APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**AFFIRMING**

William Mattingly was convicted of second-degree manslaughter and attempted second-degree manslaughter. He was sentenced to twenty years in accordance with the jury's finding that he was a first-degree persistent felony offender (PFO). Mattingly now appeals his convictions to this Court. After review, we affirm.

## I.    FACTUAL BACKGROUND

Mattingly and the victims in this case, Tommy Grismer (Tommy) and Chris Bloyd (Chris), met during a short stint in a rehabilitation center for drug addiction. Tommy and Chris were released from the center a week before Mattingly. The day Mattingly left the center he contacted Chris and they got a hotel room for the night where they intended to hang out and do drugs. Chris and Mattingly bought some methamphetamine (meth) and began drinking alcohol and smoking meth in the hotel room.

Shortly thereafter Chris asked his friend Toby Clark (Toby) and his fiancé Crystal Dishon (Crystal) to come to the hotel. Toby had been Chris' friend since childhood but Mattingly did not know Toby or Crystal. Crystal was the only one in the group with a vehicle, so she later went to pick up Tommy. Tommy brought a hypodermic needle with him, and the group began to "shoot" the meth intravenously.

Both Chris and Crystal[1] testified that when Mattingly shot the meth, his demeanor instantly changed. Prior to that the mood in the room was light and everyone was "having a good time." But when Mattingly shot up, he instantly became paranoid and violent. Mattingly grabbed Tommy and put him in a standing chokehold while holding a glass beer bottle in his other hand. Mattingly commanded that no one move, or he would kill Tommy. Mattingly also started asking why they were all out to get him and made them lift up their shirts to prove that none of them had a gun. Mattingly then demanded that Chris walk into the bathroom with him and Tommy.

Mattingly, with Tommy still in a chokehold, and Chris walked into the bathroom. Mattingly made Chris close the door and stand with his hands against the door with his back to Mattingly. Chris tried to convince Mattingly that no one was going to hurt him, but he would not listen. Chris turned and saw Mattingly choke Tommy to death and drop him. Mattingly then put Chris in a chokehold and commanded that Toby and Crystal slide a phone under the bathroom door. Mattingly called 911 and told them Tommy was overdosing.

When responding officer Jason Hilliard arrived on scene, he had to break the bathroom door to get in. Ofc. Hilliard testified that when he got into the

---

[1] Investigating officers were unsuccessful in locating Toby to testify.

bathroom, he saw three men stacked on top of each other. Tommy was on the bottom of the pile, blue and unresponsive. Mattingly was in the middle with his back on Tommy, and Chris was on top. Mattingly had Chris in a chokehold, which he refused to release until Ofc. Hilliard pointed a gun at him.

After his arrest, Mattingly requested to be examined by EMS personnel at the crime scene because he had an elevated heartrate. The paramedic who assessed him said he believed Mattingly was under the influence of meth based on his observations of Mattingly's elevated heartrate, dilated pupils, paranoia, agitation, and nervousness. The paramedic further stated that Mattingly was not able to make medically informed decisions and was therefore transported to the hospital. Mattingly's primary diagnosis was rhabdomyolysis[2] with a secondary diagnosis of acute meth intoxication.

At trial, Mattingly conceded that he killed Tommy and attempted to kill Chris. However, he asserted that he had a drug-induced, truly held yet mistaken belief that he needed to use force in self-defense against Tommy and Chris. There was no evidence presented that anyone actually intended to harm Mattingly in any way that evening.

Additional facts are discussed below as necessary.

## II.  ANALYSIS

Mattingly asserts four arguments on appeal. First, that he was denied his due process right to present a defense when the trial court ruled that a

---

[2] Rhabdomyolysis is "the destruction or degeneration of muscle tissue...accompanied by the release of breakdown products into the bloodstream and sometimes leading to acute renal failure." https://www.merriam-webster.com/dictionary/rhabdomyolysis?src=search-dict-box (last visited March 3, 2020).

mental health expert could not testify that he was legally insane during the offenses. Next, that the trial court erred by not suppressing his post-arrest statement to the police. Third, that two statements made by the Commonwealth during its closing argument violated his right to a fair trial. Finally, that he is entitled to a new penalty phase hearing.

## A. THE TRIAL COURT DID NOT ERR BY FORBIDDING TESTIMONY THAT MATTINGLY WAS LEGALLY INSANE DURING THE CRIMES

Before trial, the defense retained a licensed clinical psychologist, Dr. Wayne Herner, to evaluate Mattingly's criminal responsibility. The trial court ultimately ruled that Dr. Herner could testify, but he could not testify that Mattingly was legally insane at the time of the offenses. Mattingly's first assertion to this Court is that limiting Dr. Herner's testimony in this manner denied Mattingly his due process right to present a defense.[3] This Court reviews a trial court's ruling on the admission of evidence for abuse of discretion.[4] A trial court abuses its discretion when it rules in a way that is arbitrary, unreasonable, unfair, or unsupported by sound legal principles.[5]

Mattingly insists that Dr. Herner's report concluded that Mattingly was legally insane at the time of the offenses, and that Dr. Herner should therefore have been permitted to testify to that effect. We disagree. The relevant portion of Dr. Herner's report states:

> Based on all the available data, it is this psychologist (sic) opinion with a reasonable degree of psychological certainty that **Mr. Mattingly was indeed suffering an**

---

[3] This argument was properly preserved for appeal. Based on the court's ruling, the defense did not call Dr. Herner to testify at trial. The defense informed the court that, had Dr. Herner testified, he would have discussed Mattingly's significant psychiatric history and that Mattingly was not guilty due to insanity because of meth intoxication and rhabdomyolysis. *See* Kentucky Rule of Evidence (KRE) 103(a)(2).

[4] *Holt v. Commonwealth*, 250 S.W.3d 647, 652 (Ky. 2008).

[5] *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

**acute psychotic paranoid episode at the time of the index offense, precipitated by acute polysubstance abuse (methamphetamine, MDMA, and heroin) with increased confusion compounded by the rhabdomyolysis.**

Review of all of the witness reports are essentially consistent in the description of how the offense unfolded, describing the irrational paranoia and hypervigilance displayed by Mr. Mattingly. All the available information indicates that **Mr. Mattingly was in all psychological certainly laboring under a drug induced irrational psychotic/delusional system during the time of the index offense preventing him from appreciating the nature of his acts or controlling his actions**. Admittedly his action were only two (sic) "protect himself" from a perceived threat.[6]

Clearly, Dr. Herner did in fact believe Mattingly was having a psychotic episode during the offenses. However, Dr. Herner concluded that the episode was drug-induced, and not the result of a mental illness or defect.

Kentucky's insanity statute, when satisfied, absolves a criminal defendant of all culpability for a crime if, "at the time of such conduct, *as a result of mental illness or intellectual disability*, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law."[7] In that vein, this Court has previously held that, "[d]rug addiction, by itself, is not a disease constituting or leading to 'mental illness,' and "[t]he legislature of this state has not expressed any intention that drug addiction arising from the voluntary ingestion of drugs, by itself, affords a defense to a criminal charge based on mental illness."[8]

---

[6] Emphasis added.

[7] Kentucky Revised Statute (KRS) 504.020(1) (emphasis added).

[8] *Lickliter v. Commonwealth*, 142 S.W.3d 65, 68 (Ky. 2004) (citing *Commonwealth v. Tate*, 893 S.W.2d 368 (Ky. 1995)).

Therefore, Dr. Herner could not testify that Mattingly was insane during the offense. The fact that Mattingly was also diagnosed with rhabdomyolysis does not change this conclusion. The trial court did not err by limiting Dr. Herner's testimony accordingly.

## B. THE TRIAL COURT COMMITTED HARMLESS ERROR WHEN IT FAILED TO SUPPRESS MATTINGLY'S POST-ARREST INTERVIEWS

Mattingly was taken directly to the hospital from the crime scene. Shortly after Mattingly arrived at the hospital, Detective Leigh Maroni and Lieutenant Donny Burbrink interviewed him. At that time the officers were still uncertain about Tommy's cause of death, but Mattingly was in custody for possession of a controlled substance. Mattingly was therefore handcuffed to the bed throughout the questioning. Det. Maroni read Mattingly his "Miranda rights" before questioning him first for approximately fifty-four minutes, and Lt. Burbrink arrived towards the end of the interview. Twenty minutes after the first interview ended, Lt. Burbrink, with Det. Maroni present, conducted the second interview which lasted about thirty-two minutes. The interviews, which are audio only, were conducted somewhere between four and five hours after Mattingly last ingested meth.

Mattingly asserts that the trial court committed reversible error when it denied his motion to suppress these post-arrest interviews because they were not given voluntarily, knowingly, and intelligently.[9] This Court's review of a trial court's ruling on the suppression of evidence is a two-part inquiry: "we review the trial court's factual findings for clear error, and deem conclusive the

---

[9] This error was properly preserved by Mattingly's pre-trial motion to suppress. Kentucky Rule of Criminal Procedure (RCr) 9.22.

trial court's factual findings if supported by substantial evidence. The trial

court's application of the law to the facts we review de novo."[10]

Whether a statement during a custodial interrogation was given

voluntarily, knowingly, and intelligently, as required by *Miranda v. Arizona*,[11]

has two distinct components:

> First, the relinquishment of the right must have been
> voluntary in the sense that it was the product of a free
> and deliberate choice rather than intimidation,
> coercion, or deception. Second, the waiver must have
> been made with a full awareness of both the nature of
> the right being abandoned and the consequences of
> the decision to abandon it. Only if the totality of the
> circumstances surrounding the interrogation reveal
> both an uncoerced choice and the requisite level of
> comprehension may a court properly conclude that the
> Miranda rights have been waived.[12]

Here, the trial court found that Mattingly's statement was voluntary

based on its finding that "[t]here [was] no indication that Maroni or Burbrink

used any threatening or coercive tactics to get Defendant to talk. Their tone of

voice, choice of words and subject matter were devoid of deception, threats, or

lies. Defendant consistently wanted to speak with Maroni." We hold there was

no error in this factual finding, nor with the resulting legal conclusion that

Mattingly voluntarily gave his statement. Review of the interview recordings

demonstrates that Mattingly wanted to talk to the officers. Several times

throughout the interviews Mattingly asks the officers if they are going to talk to

---

[10] *Williams v. Commonwealth*, 364 S.W.3d 65, 68 (Ky. 2011).

[11] 384 U.S. 436 (1966).

[12] *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (internal quotation marks and cites omitted).

him and listen to him, and there is no indication that Mattingly's "will was overborne" by the officers in any way.[13]

Regarding whether Mattingly's waiver was knowing and intelligent, the trial court stated:

> The court has considered the totality of the circumstances leading up to his recorded interview, including his drug use, his compliance when arrested, his request for medical attention, his improved condition as the morning progressed, his consistent requests to speak to detectives, his ability to recall events of the evening and morning, his theory of being set up by the other two men, and his concern for his children. Despite some bizarre comments during the interview, he was able to understand and respond coherently.

Most of the facts cited by the trial court certainly have support from the record. However, after review of the interview recordings, we hold that the trial court erred by finding that Mattingly's waiver was knowing and intelligent.

To begin, it is abundantly clear that Mattingly was still highly intoxicated during the interviews: his speech was slurred, he was difficult to understand, he asked the detectives the same questions repeatedly as though he did not remember asking them before, and he would go off on repetitive, odd, rambling tangents that had no correlation to the questions he was asked. The officers had to ask him to focus numerous times and had to ask the same leading questions multiple times to get any sort of answer. More often than not Mattingly didn't respond meaningfully to the questions the officers asked. The foregoing can be said about the entirety of both interviews.

---

[13] *Soto v. Commonwealth,* 139 S.W.3d 827, 847 (Ky. 2004) (internal citations and quotation marks omitted).

Further, at least once during both interviews, a doctor came in the room to check on Mattingly. Mattingly did not seem to understand that the doctors were trying to give him medical treatment and would not respond meaningfully to their questions either. Mattingly was in fact so out of it that at one point after a doctor left the room Det. Burbrink seemed to get exasperated with him and said, "Tony.[14] Look at me. Nobody...is going...to hurt you. Here's the deal, he is a doctor, Tony. Nobody is going to hurt you. You have to understand this. Nobody, while we are in this room with you is going to hurt you." The fact that Mattingly was unable to understand the role of a treating physician while he was a patient in a hospital room calls into question whether he truly understood the purpose and gravity of his interview with the officers.

Of course, a defendant's intoxication alone does not render his statement inadmissible.[15] "[A] confession may be suppressed when the defendant was intoxicated to the degree of mania or was hallucinating, functionally insane, or otherwise unable to understand the meaning of his statements."[16] Here, Mattingly was very obviously suffering from some form of delusion throughout the course of the interviews. He stated numerous times during both interviews that he had the ability to see things before they happened; that either God, his late father, or his late brother spoke to him and told him the future before it occurred. He seemed to imply that he believed someone or something spoke to him that night and told him he was being set up, but his statements are so incoherent it is difficult to discern.

---

[14] Mattingly goes by the name Tony.

[15] *Id.* at 848 (citing *Britt v. Commonwealth*, 512 S.W.2d 496 (Ky. 1974)).

[16] *Smith v. Commonwealth*, 410 S.W.3d 160, 164 (Ky. 2013) (internal quotation marks omitted).

Accordingly, based on the foregoing totality of the circumstances, we hold that the trial court erred by failing to suppress Mattingly's post-arrest interviews.

But that is not the stopping point of our analysis. When a trial court fails to suppress a statement taken in violation of *Miranda*, "[r]eversal is not required if the error complained of is harmless beyond a reasonable doubt."[17] In this case, we hold that the error was harmless beyond a reasonable doubt because the jury ultimately returned one of the verdicts Mattingly requested.

At trial, the jury was instructed on murder and attempted murder, first-degree manslaughter and attempted first-degree manslaughter, second-degree manslaughter and attempted second-degree manslaughter, and reckless homicide and attempted reckless homicide.

As previously mentioned, Mattingly conceded all of the *actus reus* elements for these offenses: he did not dispute that he killed Tommy and attempted to kill Chris. However, the point of contention between the Commonwealth's case and the defense's case was that Mattingly did not have the requisite *mens rea* for murder and attempted murder or first-degree manslaughter and attempted first-degree manslaughter. The reason being that these offenses did not allow the jury to find that Mattingly had a truly held, yet mistaken belief that he needed to use force against Tommy and Chris for his own protection. But second-degree manslaughter and attempted second-degree manslaughter as well as reckless homicide and attempted reckless homicide did allow for that finding. Because of this, the defense specifically stated at least twice in its closing argument that the jury, by law, had to find

---

[17] *Id.*

Mattingly guilty of either second-degree manslaughter and attempted second degree manslaughter or reckless homicide and attempted reckless homicide.

Ultimately, the defense got what it requested when the jury found Mattingly guilty of second-degree manslaughter and attempted second-degree manslaughter. Thus, playing Mattingly's statements for the jury was harmless beyond a reasonable doubt. It had no prejudicial effect on the jury's ability to find that Mattingly had a truly held yet mistaken belief he needed to use force to protect himself from Tommy and Chris.

## C. THE COMMONWEALTH'S CLOSING ARGUMENT DID NOT VIOLATE MATTINGLY'S RIGHT TO A FAIR TRIAL

Next, Mattingly argues that two statements made by the Commonwealth during its closing argument violated his right to a fair trial.[18] Regarding the first statement, the Commonwealth began by going into great detail about how manual strangulation by chokehold is a painful way to die. Then the Commonwealth said the following:

> Now, why did I just go on and on about this? Alright, I went on and on about this because this is the reality of this case. This is the reality about what happened to Tommy Grismer (gesturing to the gallery) a son, a mother, an uncle, a human being.[19] It's not easy, it's hard for me as a parent to stand up in front of these parents (gesturing to the gallery again).

The defense objected to this statement, arguing that the Commonwealth was making an emotional appeal to the jurors. Later, in the second statement at issue in this appeal, the Commonwealth argued:

---

[18] This alleged error was preserved by the defense's contemporaneous objection to the statements. RCr 9.22.

[19] On the first day of trial, Tommy's brother testified that many members of Tommy's family were in the gallery to watch the trial. Though closing arguments occurred on the third day of trial, we presume that those family members were still present.

> The defendant claims that this is not murder. He
> claims that this is not murder. If this is not murder,
> what is murder? Our laws do not permit, and our
> society is not ready to allow someone who chooses to
> consume illegal drugs, put these drugs into his body,
> get high, and now claim no responsibility—

At this point the defense objected and requested a mistrial on the grounds that the Commonwealth was asking the jury to send a message about what we as a society will not tolerate, and that she was not arguing the law.

But closing arguments are just that, arguments. They are not evidence. Consequently, attorneys are given wide latitude in what they choose to argue. Therefore, our review "must center on the essential fairness of the trial as a whole, with reversal being justified only if the prosecutor's misconduct was so improper, prejudicial, and egregious as to have undermined the overall fairness of the proceedings."[20] Specifically, this Court may only reverse on the basis of prosecutorial misconduct during closing argument "if the misconduct is 'flagrant' or if each of the following three conditions is satisfied: (1) Proof of defendant's guilt is not overwhelming; (2) Defense counsel objected; and (3) The trial court failed to cure the error with a sufficient admonishment to the jury."[21]

In this case, the Commonwealth's closing argument does not satisfy the test for flagrant misconduct because the proof of Mattingly's guilt was overwhelming. Again, Mattingly conceded that he killed Tommy and tried to kill Chris, and the only issue for the jury to decide was what his state of mind was during the commission of those crimes. And Mattingly received one of the

---

[20] *Dickerson v. Commonwealth*, 485 S.W.3d 310, 329 (Ky. 2016) (internal quotation marks omitted).

[21] *Barnes v. Commonwealth*, 91 S.W.3d 564, 568 (Ky. 2002).

sentences he requested that the jury return. We therefore hold that the Commonwealth's closing argument did not "undermine the fairness of the overall proceedings."

### D. MATTINGLY IS NOT ENTITLED TO A NEW SENTENCING HEARING

Mattingly's final argument is that he is entitled to a new sentencing hearing because the jury was incorrectly informed that he was previously convicted for second-degree burglary, rather than his actual conviction of third-degree burglary. He concedes this issue was not preserved for our review, but requests palpable error review under RCr 10.26:

> A palpable error which affects the substantial rights of a party may be considered by the court on motion for a new trial or by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error.

Accordingly, we may only grant Mattingly a new penalty phase if a manifest injustice resulted from the alleged error.

During Mattingly's sentencing hearing the Commonwealth sought to prove that he qualified for first degree PFO status, meaning he had previously been convicted of two or more felonies.[22] The Commonwealth called Shawna Farmer, a paralegal with the Commonwealth's Attorney's office, to testify about Mattingly's prior convictions. On direct examination the Commonwealth had the following exchange with Ms. Farmer:

**CW:** Alright, go on to the next conviction.

**SF:** Marion County Circuit Court, 96-CR-00040.

**CW:** And what was the offense date?

---

[22] KRS 532.080(3).

**SF:** February 23, 1996.

**CW:** And what offense was he convicted of?

**SF:** Burglary second-degree and theft by unlawful taking over $300.

**CW:** And were any of those crimes felonies?

**SF:** Both.

On cross-examination the defense corrected Ms. Farmer's mistake:

**D:** And can you tell me what charge that actually says he pled guilty to?

**SF:** Complicity to commit burg (sic) third, theft by unlawful taking over three hundred.

**D:** So you just previously testified that he was convicted of burglary in the second degree, is that correct?

**SF:** Yes.

**D:** Would you agree now that that is not correct?

**SF:** That's correct.

Finally, the Commonwealth clarified on re-direct that both second-degree burglary and third-degree burglary are felonies.[23]

Mattingly now argues, correctly, that a sentencing phase jury cannot hear evidence of prior charges that were dismissed or amended down.[24] However he concedes in his brief to this Court that "to be sure, the record does not demonstrate this charge had been amended down." After review, we agree that the record does not suggest that Mattingly's third-degree burglary charge was amended down from a second-degree burglary charge. Instead, it appears that Ms. Farmer misspoke, and her mistake was later corrected by the defense.

---

[23] *See* KRS 511.030(2) and KRS 511.040(2), respectively.

[24] *Martin v. Commonwealth,* 409 S.W.3d 340, 348 (Ky. 2013).

We accordingly hold that no manifest injustice resulted from Ms. Farmer's testimony.

## III. CONCLUSION

Based on the foregoing, we affirm.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Joshua Michael Reho
Louisville Metro Public Defender

Leo Gerard Smith
Louisville Metro Public Defender

COUNSEL FOR APPELLEE:

Daniel Jay Cameron
Attorney General of Kentucky

Mark Barry
Assistant Attorney General

# Supreme Court of Kentucky

## 2019-SC-000242-MR

WILLIAM MATTINGLY                                APPELLANT

ON APPEAL FROM JEFFERSON CIRCUIT COURT
V.         HONORABLE JUDITH E. MCDONALD-BURKMAN, JUDGE
NO. 15-CR-003102

COMMONWEALTH OF KENTUCKY                 APPELLEE

## ORDER DENYING PETITION FOR REHEARING

The Petition for Rehearing, filed by the Appellant, of the Memorandum Opinion of the Court, rendered April 30, 2020, is DENIED.

All sitting. All concur.

ENTERED: July 9, 2020.

_____
CHIEF JUSTICE